90 So.2d 124 (1956)
Aubrey McDONALD, Appellant,
v.
Curtis R. MILLER and Emery Campbell, J.B. Sharon and Coy Burgess, constituting the Canvassing Board of Walton County, Florida, Appellees.
Supreme Court of Florida. Special Division A.
October 24, 1956.
*126 Coe & Coe, Pensacola, for appellant.
James N. Daniel, Chipley, for Curtis R. Miller and S.M. Preacher, De Funiak Springs, for the Canvassing Board of Walton County, Florida, for appellees.
THORNAL, Justice.
Appellant McDonald who was plaintiff below seeks reversal of a final decree dismissing his complaint in an election contest proceeding brought pursuant to Section 99.192, Florida Statutes 1955, F.S.A.
We are called upon to determine the validity of the 1956 second primary election held to elect the Democratic nominee for Sheriff of Walton County.
Appellant McDonald was the incumbent sheriff. In the second primary election held in Walton County on May 29, 1956, McDonald was opposed by appellee Miller. When the polls closed on election day the voting machine totals revealed that McDonald had received 2,936 votes on the machines and Miller had received 2,908 votes. On the basis of the votes recorded by the voting machines, McDonald therefore had a majority of 28 votes. There were 271 absentee ballots counted by the Canvassing Board which met on Thursday following the Tuesday primary. After the absentee ballots were tabulated, the Canvassing Board certified that Miller was the winner by 7 votes.
Within the time permitted by Section 99.192, Florida Statutes 1955, F.S.A., appellant filed his complaint in chancery naming Miller and the Canvassing Board as parties-defendant. By the complaint he contested the election on the general ground that there were sufficient illegal votes among the absentee ballots to change the result of the election. It should be pointed out that all of the absentee ballots that were counted were intermingled by the Board at the time of the Canvass. It is impossible to isolate one from the other to determine who voted for whom. Specifically, the alleged illegalities consisted of the following:
(a) Three absentee votes were cast by non-residents of Walton County.
(b) Four absentee votes were cast by people who had not personally applied for or delivered their absentee ballots to the supervisor of registration either in person or by mail. The applications and ballots for these voters were obtained by one John Dobbs from the supervisor, delivered by him to the voters, signed and marked by them, received from the voters by Dobbs, and subsequently delivered by him to the supervisor.
(c) Three absentee voters obtained their applications for ballots and received their ballots from and delivered them to a Mrs. Spence. It is unnecessary to discuss these further for the reason that the record developed that Mrs. Spence was a duly appointed deputy supervisor of registration.
(d) Allegedly twelve absentee voters marked their ballots in the presence of one Beardon and one Linton. Appellant contends that this impinged on the required secrecy of the ballot and destroyed the validity of these twelve absentee votes.
(e) Allegedly twenty absentee ballots were marked in the presence of one Jordan. Similarly, it is contended that the alleged violation of secrecy destroyed the validity of these votes.
(f) Thirty-two persons applied for and received ballots during normal business hours of the supervisor of registration on Thursday, May 24, prior to 5:00 p.m. Appellant contends that under Section 101.64, Florida Statutes 1955, F.S.A., the time for making application for an absentee ballot ended at 5:00 p.m., Wednesday, May 23.
The Chancellor heard all of the evidence. Regardless of the conclusion which we hereafter reach, we observe that this record reflects no great tribute to the procedures *127 followed in holding this election. Although of course disputed, there was testimony that absentee votes were bartered and sold. There is certainly strong evidence to suggest that in numerous instances workers for the candidates completely ignored the constitutional provisions preserving secrecy of the ballot. Time and again during the taking of the testimony, the able Chancellor with an admirable awareness of his judicial responsibilities found it necessary to warn witnesses of the possibility of self-incrimination and their right to elect not to testify. When so warned, many of them did elect not to testify. This they had a right to do.
As we read the record we are not impressed by the proclamations of either party attempting to demonstrate their concern for the purity of the ballot or for the freedom of elections.
Be this as it may, the Chancellor concluded that the three ballots cast by admittedly non-residents could not be counted but that otherwise the evidence failed to establish sufficiently the illegality of an adequate number of absentee votes to change the results of the election. He held, moreover, that appellant was estopped to claim the illegality and dismissed the complaint. Reversal of the final decree is now sought.
Appellant contends for the rule that the absentee ballots assaulted were illegal, that they were intermingled with the legally cast absentee votes, that it is impossible to separate the tainted votes from the untainted and that, therefore, the entire absentee vote should be set aside. The results would then depend upon the vote recorded by the machines showing appellant with a 28-vote majority.
Appellees contend that with the exception of the 3 non-residents, the remainder of the absentee votes were perfectly legal and that by eliminating the three, the ultimate result of the election would not be affected.
It is necessary for us to consider each group of absentee votes described above in order to lead to the conclusion which we reach. Obviously, the 3 non-residents were properly eliminated. The briefs now concede that the 3 votes handled by the deputy supervisor were legally cast.
The two groups of 12 and 20 absentees in which the ballots were allegedly marked within the view of other persons must be considered. The guaranty of secrecy in exercising the right to vote is one personal to the voter. He has a right to insist that knowledge of his decision at the polls remain his own. Under our system it is a constitutional privilege which cannot be withdrawn by law. It is nonetheless a privilege personal to the voter. If he desires to waive it, he may. The mere fact that the voter permits someone else to learn for whom he voted does not destroy the validity of the vote. Certainly the practice that was followed by the enthusiastic campaign workers in this case is not to be commended. There is every indication that in their effort to "elect their man", they went out into the highways and byways and brought in the halt, the lame, the blind and the ignorant. There is no indication that their interest in these people was inspired by motives of good citizenship aimed at encouraging all qualified citizens to vote. On the contrary, the record is permeated with indications and innuendoes that the sole objective sought by these campaign workers was to influence the thinking of many people who cared little about voting and who actually were having trouble thinking for themselves. Nevertheless, the ultimate votes cast were not illegal and we are therefore not authorized to discount them. State ex rel. Hutchins v. Tucker, 106 Fla. 905, 143 So. 754; Cooley's Constitutional Limitations, 8th ed., Vol. 2, p. 1376.
With reference to the 32 votes allegedly applied for and received beyond the statutory deadline, the Chancellor again ruled correctly. Section 101.62, Florida Statutes, F.S.A., provides in substance that any elector who will be absent from the *128 county on election day or "who is physically incapable of appearing at the polling place" may make application to the supervisor or his deputies "either in person or by mail, at any time during the forty-five days preceding any election, but not later than 5:00 p.m. of the fifth day preceding such election * * *." Appellant contends for an application of the rule that in measuring the time within which an act is to be done, intervening Sundays are excluded if the period is less than seven days. By applying this rule to the cited statute appellant contends that the deadline for making application for an absentee ballot is 5:00 p.m. on Wednesday, preceding the election on the next ensuing Tuesday. Like the Chancellor, we cannot give the appellant the benefit of this rule. Absentee voting was unknown to the common law. Therefore, authorizing statutes should be cautiously and specifically followed. An examination of the statute reveals that it is very specific. The application may be obtained during the forty-five days preceding the election but it cannot be obtained later than 5:00 p.m. "of the fifth day" preceding the election. We cannot read into this act any justification for applying the rule for measuring time which appears so comforting to the appellant. The statute says "the fifth day" and the fifth day preceding an election held on a Tuesday is the preceding Thursday. Therefore, any application for an absentee ballot properly obtained before 5:00 p.m. on such preceding Thursday is legally obtained.
We have disposed of all of the alleged illegalities except the four absentee ballots handled by the man named John Dobbs. Reverting to these, it will be recalled that Dobbs who was not an official of the supervisor's office called for applications for absentee ballots and the blank ballots for our people. He then took them to the four voters, who signed the applications and marked the ballots. Thereupon, Dobbs resumed complete charge of the situation, put the ballots in his pocket and went out in search of a Notary Public who would "take the acknowledgments" on the applications outside of the presence of the voters themselves. Section 101.62, supra, clearly requires that the application for an absentee ballot must be applied for by the voter himself "either in person or by mail". The application blank must be immediately sent to the absentee elector by mail or delivered to him by hand. Likewise, under Section 101.65, Florida Statutes, F.S.A., the marked ballot must be returned to the supervisor either by mail or by personal delivery by the voter himself. In the course of his quest for a Notary Public, Dobbs went to the Sheriff's office looking for someone to affix a jurat. While there, he saw the Sheriff, who is now the complaining appellant, and told him he had the ballots in his pocket, although he doesn't recall telling the Sheriff who the voters had voted for. On this record they could have been for the Sheriff himself. No one seems to know. The appellant therefore had this information well in advance of the election and certainly long before the Canvassing Board intermingled all of the absentee ballots. He made no move whatever to stop the procedure which he now alleges to have polluted all 271 absentee votes.
In addition to this, throughout all of this absentee voting period, the appellant had one or more of his deputies stationed either inside or just outside of the office of the supervisor of registration. These deputies testified that they saw what was going on from day to day. They testified with reference to alleged buying of absentee votes. They testified with reference to the alleged misconduct of workers in watching over the absentee voters as they marked their ballots. More important, they testified that they reported all of this to the appellant himself from day to day. According to the testimony of one deputy, he actually took the man Beardon to the Sheriff's office and told the Sheriff of alleged vote buying. Appellant-Sheriff supposedly told Beardon that "he was going to put him in jail if he caught him buying *129 votes". To this Beardon allegedly replied: "I am buying them all right, but you have got to catch me before you can do anything." In fairness to Beardon, he took the stand and denied this under oath. These are now among the very votes which appellant contends should be laid aside with the resultant effect of changing the ultimate totals. As a matter of fact, in regard to the 20 votes alleged to have been "supervised" by the witness Jordan, the deputy himself testified that he saw how the people voted and they voted about "half and half" for Mr. McDonald and Mr. Miller. One cannot stand by with full knowledge and acquiesce in this type of conduct prior to an election and then, after being disappointed by the results, successfully overturn the election. For an analogous principle though not directly on the point, see McGregor v. Burnett, 105 Fla. 447, 141 So. 599; Pearson v. Taylor, 159 Fla. 775, 32 So.2d 826.
Appellant relies on an equitable doctrine that if there are sufficient tainted ballots among the absentees to change the result and the good have been mixed with the bad, making separation impossible, then the good fall with the bad. Reinhart v. State, 145 Fla. 612, 200 So. 218. See also Parra v. Harvey, Fla., 89 So.2d 870. Unfortunately, appellant should have made this assault before he permitted the absentee ballots to be intermingled. He was fully aware of the alleged "goings on". Before the absentee votes were intermingled he had an adequate opportunity to apply to the court to prevent the intermingling. At least 10 of the votes which he now claims were tainted were actually cast for him. This was brought out by cross-examination of his own witness who was his deputy. After docilely standing by and permitting the situation to come about and actually in a measure participating in it through the conduct of his deputies, we cannot give him the benefit of the rule which he so earnestly seeks to apply. The two candidates actually attended the Canvass, stood by, permitted the intermingling and watched the ensuing tally of the absentee votes. The Chancellor ruled correctly that under the circumstances reflected by this record, the appellant was estopped to claim the relief sought and that he would leave the parties where the voters of Walton County had placed them.
Finding no justification to question the decision of the electors, under the circumstances revealed by this record, it is our view that the decree of the Chancellor should be and it is hereby
Affirmed.
DREW, C.J., and HOBSON and ROBERTS, JJ., concur.