323 So.2d 259 (1975)
Edward F. BOARDMAN, Petitioner,
v.
Henry ESTEVA, Respondent.
No. 46282.
Supreme Court of Florida.
September 30, 1975.
Rehearing Denied January 6, 1976.
*261 J. Michael Hayes, Gregory, Cours, Paniello, Johnson & Hayes, Tampa, and Joseph C. Jacobs and Robert J. Angerer, Ervin, Varn, Jacobs & Odom, Tallahassee, for petitioner.
Leo Foster, Tallahassee, and Henry Esteva, in pro. per., for respondent.
ADKINS, Chief Justice.
On petition for certiorari, we have for review a decision of the First District Court of Appeal in Esteva v. Hindman, 299 So.2d 633 (Fla.App.1st, 1974), which allegedly conflicts with this Court's decision in State ex rel. Hutchins v. Tucker, 106 Fla. 905, 143 So. 754 (1932). The source of our jurisdiction is Fla. Const., art. V, § 3(b) (3), F.S.A.
This is a contest of the October 3, 1972, election for a seat on the Second District Court of Appeal, in which the petitioner, Boardman, was declared winner over respondent, Esteva. Although Esteva received 404 more machine or regular votes than did Boardman, the latter received 653 more absentee ballots, for an overall majority of 249 votes. This dispute solely involves the validity of the 3,389 absentee ballots cast in the election.
Esteva brought suit in the Circuit Court for the Second Judicial Circuit seeking to have the court declare him the winner of the election on the basis of the machine vote only, and to have the election declared illegal in respect to the absentee ballots cast. Although no fraud or wrongdoing was charged, Esteva alleged that there were some 1450 irregularities or errors in the absentee ballots. Therefore, since 250 votes for Esteva could change the result of the election and it was impossible to identify for whom the illegal ballots had been cast, the ballots being commingled, the absentee ballots should be thrown out. The trial judge, after considering the pleadings, admissions, affidavits and other matters on file, together with arguments of counsel for the respective parties and their briefs, granted summary judgment for Boardman, finding that of the 1450 alleged flaws, only 88 set forth a real basis to conclude that the ballots were illegal. Among these were 13 in which the application was not signed by the applicant, 17 in which return envelopes were not signed across the flap, 39 in which the official title of the subscribing witness was not indicated and 19 in which the names of the electors were not on record.
The trial court concluded that the remainder of the alleged irregularities involved *262 a number of "clerical misprisions or omissions, most of which are of so little real significance as to be fairly classified as unsubstantial." For example, the court found:
"(d) There are shown 16 in which the reason for voting absentee was not specifically indicated on the application and 79 in which such reason was not indicated on the return envelope. Each of these forms contains the five categories of persons who may vote absentee with instructions to `check appropriate reason'. Failure to put a check mark into one or more of those designations is not deemed fatal to the validity of the ballot. The signature of the elector is adequate to at least certify that one or more of the reasons is applicable and in the case of the certificate on the return envelope it is under oath. Even if these are to be counted illegal they would not change the results.
"(e) The other irregularities, such as address of attesting witness omitted, post office cancellation stamp not affixed, vague identification of witnesses, failure of deputies to record oath, and the other discrepancies are not of vital consequence and may be attributed more logically to human misunderstanding of minute technicalities than to lack of diligence to comply with essential requirements. Fraud, corruption or gross negligence are completely absent.
"(f) The plaintiff urges that all absentee votes of Hillsborough County, of which Esteva received 133 and Boardman 320, must be suppressed because they were counted and returns made in accordance with an injunction order of the Circuit Court of Hillsborough County in the case of Levine, et al. v. Falsone, et al., constituting the Canvass Board, Case No. 213299. It is contended that such procedure ordered by the Court violated F.S. 101.68 and other statutes and breached the fundamental requirement of secrecy. This Court does not interpret the Hillsborough Circuit Court order as having that effect and has not overlooked Papy v. Englander, Fla.App. (Third) 267 So.2d 111. However, in any event this Court has no appellate supervision of the circuit court which rendered the injunctive order, and will make no judgment except to approve the obedience of the election officials to its commands and to accept their returns pursuant thereto."
On appeal, the District Court reversed, declaring Esteva the winner of the election. After concluding that the "Florida courts have long maintained and restated the principle that strict compliance with the statutory requirements for absentee voting is mandatory," the District Court held:
"Thus far, we have shown irregularities sufficient to invalidate 612 absentee votes cast in this election. These include the 88 found by the trial court, the 16 in which no reason for voting absentee was indicated on the application, the 79 in which no such reason was indicated on the return envelope, and the 429 in which the envelopes were lost in Polk, Hendry and Glades counties. There are numerous other errors and omissions shown by appellant, such as vague identification of witnesses and omission of post office cancellation stamps and addresses of witnesses. Furthermore we have grave doubts as to the validity of the Hillsborough County Canvass of absentee ballots which numbers 453, with regard to the fundamental requirement of the secrecy of the ballot. However, we do not deem it necessary to rule on these other alleged irregularities in light of our conclusion that the irregularities found are sufficient in number to affect the results of this election."
At issue is whether the absentee voting law requires absolute strict compliance with all its provisions, or whether substantial compliance is sufficient to give validity to the ballot.
*263 We first take note that the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of, by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or we risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.
Notably existent in this dispute is the complete absence of any allegation of fraud, gross negligence or even the hint of intentional wrongdoing, either on the part of the voters or of the election officials Assuming that the absentee ballots counted in the election were cast by qualified, registered electors, who were otherwise entitled to vote absentee, notwithstanding the alleged defects, a majority of the voters in the Second District preferred Mr. Boardman over Mr. Esteva in October, 1973. This must not be overlooked. If we are to countenance a different result, one contrary to the apparent will of the people, then we must do so on the basis that the sanctity of the ballot and the integrity of the election were not maintained, and not merely on the theory that the absentee ballots cast were in technical violation of the law.
In 1932 we first considered the construction of the absentee voting law. In State ex rel. Hutchins v. Tucker, supra, we held that several ballots had been illegally rejected and should have been counted where there had been a substantial compliance with the provisions of the absent voting statute.
Tucker was apparently overlooked seven years later when we made the statement in State ex rel. Whitley v. Rinehart, 140 Fla. 645, 192 So. 819 (1939), that the rigidity of its (absent voting statute, Ch. 16986, Acts of 1935) enforcement is an open question in this State. We held in Rinehart that, being in derogation of the common law, the absentee voting laws should be strictly construed. At issue in Rinehart, was the validity of certain absentee ballots allegedly cast by electors who were in the city on election day and other ballots cast by unregistered and unqualified citizens of some other state. These alleged defects directly affected the sanctity of the ballot, and would indeed have been held invalid under Tucker's substantial compliance test.
Frink v. State ex rel. Turk, 160 Fla. 394, 35 So.2d 10 (1948), held that the absentee voting statute must have a strict interpretation. We said that the failure to comply with the clear language of the statute to the effect that the elector must swear in his application for absentee ballot that he expected to be absent from the county and not just the city on election day rendered the ballot of no effect. We also said that the Legislature did not merely suggest a form of affidavit, but specifically stated in detail the substance and manner of its execution in Fla. Stat. § 101.07, 1941, F.S.A.[1]
*264 The strict interpretation rule was reaffirmed in the subsequent cases before this Court,[2] however, not without exceptions. In State ex rel. Titus v. Peacock, 125 Fla. 810, 170 So. 309 (1936), decided after Hutchins but before Frink, we held that an erroneous or unlawful handling of otherwise valid absentee ballots by election officials will not void the ballots, provided the votes were legal in their inception and still capable of being given proper effect as such. This principle was reaffirmed in Jolley, supra, in 1952, thus etching an exception to the general rule of strict interpretation of absentee voting laws.[3]
Without further analysis of the case law, and realizing as we do that strict compliance has been required by this Court in other cases, we now recede from that rule and hereby reaffirm the rule adopted in Tucker to the effect that substantial compliance with the absentee voting laws is all that is required to give legality to the ballot. We offer no opinion as to the validity of the ballots found to be invalid in the prior decisions had they been measured by the substantial compliance standard.
Originally absentee voting statutes were directed at making the voting privilege available to those engaged in military service. Rinehart, supra. Therefore, absentee voting was considered a privilege granted to electors, not an absolute right. Frink, supra. The purpose of the enactment of absentee voter statutes, therefore, was to enable a qualified voter to vote at a general election in the precinct of his domicile were he temporarily absent therefrom. Times obviously have changed, however, since the absentee voting laws were first enacted in Florida in 1917. We are no longer in the horse and buggy age. Society is much more mobile today and in fact depends to a great extent upon its mobility for survival. Regardless of the original reasons for the enactment of the absentee voter laws, they must be interpreted in light of modern conditions. This does not require a full scale re-enactment of the law. That is for the Legislature to do, and in fact the statute has been amended several times over the years. But the mere fact that a statute was enacted in 1917 does not require us to interpret it with a turn-of-the-century perspective. Although the convenience of the voter may not have been one of the considerations for the enactment of the absentee voting law (Rinehart), it would be naive of us to fail to recognize that the accommodation of the public has become the primary basis for the privilege of voting absentee. The Legislature of Florida recognized this when it amended the statute to provide absentee voting for persons who may be absent from the county on election day or who are physically unable to make it to the polls, or who may be prevented by their religious beliefs from voting on a particular day. See Fla. Stat. § 101.62(3), F.S.A.
*265 In developing a rule regarding how far irregularities in absentee ballots will affect the result of the election, a fundamental inquiry should be whether or not the irregularity complained of has prevented a full, fair and free expression of the public will. Unless the absentee voting laws which have been violated in the casting of the vote expressly declare that the particular act is essential to the validity of the ballot, or that its omission will cause the ballot not to be counted, the statute should be treated as directory, not mandatory, provided such irregularity is not calculated to affect the integrity of the ballot or election. Fla. Stat. § 101.67(3), F.S.A., for example, declares that the absentee ballot shall be counted only where the "application for absentee elector's ballot" is properly executed and placed in an envelope separate from the absentee ballot. It is clear, therefore, that the Legislature intended that any application not so properly executed and separated from the ballot must not be counted. This does not mean, however, that insignificant omissions or irregularities appearing on the application form suggested in Fla. Stat. § 101.62, F.S.A., must void the ballot where the information that does appear on the application is sufficient to determine the qualifications of the applicant to vote absentee, and the omissions or irregularities are not essential to the sanctity of the ballot. The Legislature did not define what it meant by the term "properly executed," nor did it say that the application form suggested in Fla. Stat. § 101.62, F.S.A., had to be strictly complied with.[4] To the contrary, Fla. Stat. § 101.62, F.S.A., states that the application shall be in substantially the same form as that found in the statute. On the other hand, the Legislature has clearly mandated that if the absent elector's ballot is not placed in an envelope separate from the absentee ballot, as required by Fla. Stat. § 101.67(3), F.S.A., the ballot will in no event be counted.
Absolute strict compliance, even with mandatory provisions in every case, however, could reach absurd proportions. For example, under a former version of Fla. Stat. § 101.64, F.S.A., an elector who certified that he would be absent from the State on election day would not have strictly complied with the statutory requirement that the elector certify his intention to be absent from the county on election day. Could it seriously be doubted that such an elector failed to state his intention to be absent from the county? Yet, his ballot would have been void under the strict compliance rule. Frink, supra.
It is true that the absentee voting statutes are in derogation of the common law and therefore must be strictly construed. Strict construction, however, does not necessarily mean strict compliance. In Brown v. Grzeskowiak, 230 Ind. 110, 101 N.E.2d 639 (1951), the Supreme Court of Indiana agreed that absentee voting laws are generally strictly construed. The Court then said:
"Even though such statutes do, under certain circumstances, extend a special privilege to those who may be away from their voting place on election day, it must be kept in mind, even when applying the rules of strict construction, *266 in ascertaining the meaning of the language used together with the intent of the Legislature, that the will of the majority of those who have legally voted is the thing to be most desired. (Emphasis ours.)
......
"`The purpose of the law and the efforts of the court are to secure to the elector an opportunity to freely and fairly cast his ballot, and to uphold the will of the electorate and prevent disenfranchisement. In the absence of fraud, actual or suggested, statutes will be liberally construed to accomplish this purpose.'" State ex rel. Harry v. Ice, 207 Ind. 65 at 71, 191 N.E. 155, at 157 (1934). (Emphasis theirs.)
"Since the Legislature has extended the privilege to certain voters who may be absent from their voting places on election day, to cast their ballots, even though absent from the polling place, the same effort must be made to extend to them an opportunity to freely and fairly cast their ballots and to prevent their disfranchisement as is made to protect the ballots and prevent the disfranchisement of those voters who are present at their voting place and cast their vote in person.
"The ultimate question for determination in an election contest is, who has received the highest number of legal votes? (citation omitted.)" 101 N.E.2d at 647.
In applying a liberal interpretation to the absentee voter law, the Indiana Court noted that the intention of the Legislature, as ascertained from a consideration of the Act as a whole, would prevail over the literal meaning of any of the terms used in the statute. We agree. Consistent with the Indiana Court's reasoning is our decision in Wilson v. Revels, 61 So.2d 491 (Fla. 1952), where we considered the legality of certain machine votes and a group of absentee ballots. The contested machine votes were not signed by the electors as required by law, but their names were written on the ballot stubs by the election officials, and the absentee ballots had been mistakenly placed in the wrong ballot box, although they were easily distinguishable from the other absentee ballots. Justice Terrell wrote for the Court:
"There is no charge of fraud or intended wrong in handling the ballots. The ground of appellant's contention is, that the absentee ballots were void because of irregularities pointed out in handling them, and that the regular ballots were void because the electors failed to sign stub number 1. The chancellor found, and the record discloses, that Liberty is a small county, that at least one of the electors (sic) knew personally each elector whose vote is challenged; that the names of the electors were written on the stub by members of the election Board after the elector was identified, and that the registration of all electors was checked before the ballot was delivered. No elector asked to sign stub number 1 and both the electors and the Canvassing Board acted without fraud, deception or purpose to conduct other than a fair election.
"It is not suggested or contended that the result of the election would have been different if the law had been tracked to the letter, nor is it suggested that the integrity of the election was affected by the way the ballots were handled. It is contended that to permit such practice to go unchallenged, opens the door for fraud and corruption of the ballot. This court is not unmindful of the truth of this contention, and, if there were any suggestion whatever of fraud or that the irregularities were purposely done to foul the election or corrupt the ballot, it would not be permitted to stand." 61 So.2d 491, at 492.
This result was reasonable and proper. The facts are similar in some degree to the situation sub judice. Here we are dealing with several small counties in which the *267 record shows that the election officials personally knew many of the voters whose ballots were allegedly invalid because of complained irregularities, such as lack of complete address of the voter on the application or return envelope, or lack of a precinct number. The record also shows that in many cases the voter simultaneously made application for the absentee ballot and cast his vote while in the office of the election officials, and that many of the voters were well known to the election officials. Although we recognize that we were dealing primarily with regular machine votes in Wilson, it would be stretching the law to unreasonable lengths to conclude that the result should be different in this case simply because we are dealing with absentee ballots. What is important in both cases is the absence of fraud or any wrong suffered from the irregularities complained of, and the fact that the will of the people was effected. Wilson, supra.
In expanding the privilege of voting to those citizens who may not be able to vote in person on election day, the Florida Legislature has prescribed statutory requirements which are intended to insure that those who vote are qualified and registered to vote and that they do so in a proper manner. There is no magic in the statutory requirements. If they are complied with to the extent that the duly responsible election officials can ascertain that the electors whose votes are being canvassed are qualified and registered to vote, and that they do so in a proper manner, then who can be heard to complain that the statute has not been literally and absolutely complied with? Strict compliance is not some sacred formula nothing short of which can guarantee the purity of the ballot. See reference to the case of Attorney General ex rel. Miller v. Miller, 266 Mich. 127, 253 N.W. 241, quoted with approval by this Court in Jolley, supra. See also, Anderson v. Budzien, 12 Wis.2d 530, 107 N.W.2d 496 (1961), where the Wisconsin Supreme Court, holding that the legislative intent in enacting the absentee voter statutes is to encourage and assist qualified voters to cast their ballots for candidates of their choice, recognized that in order to prevent fraud the Legislature specifically stated that in some instances there must be strict compliance with the statute or a ballot cannot be counted. However, the Court said that where the Legislature has not so expressly provided for strict compliance, any provisions are directory and strict compliance therewith is not required. Accord, McMaster v. Wilkinson, 145 Neb. 39, 15 N.W.2d 348 (1944), where the court cited our decision in Rinehart, supra, for the rule of strict construction of absentee voting laws, and then held:
"It is the policy of the law to prevent as far as possible the disfranchisement of electors who have cast their ballots in good faith, and while the technical requirements set forth in the absentee voting law are mandatory, yet in meeting these requirements laws are construed so that a substantial compliance therewith is all that is required." 15 N.W.2d, at 353.
Some of the errors alleged in McMaster were similar to some of those alleged here. Although some of the ballots were invalidated as a result of the errors, in other cases the court held that although the statute had not been strictly complied with, where there had been substantial compliance the absentee ballots were valid. For example, 21 ballots were held to be valid although the title of the election officer did not appear on the ballot next to the officer's signature as required by law. However, a ballot was declared void where the notary failed to fill out the elector's certificate identifying the voter.
Having decided that substantial compliance with the requirements of the absentee voting statute is all that is required to give legality to the absentee ballots, we now turn to the remaining issues. First, there is the question of the 429 missing *268 outer envelopes containing the statutorily required absentee voters' affidavits, which were either lost or destroyed by the canvassing boards in Glades, Hendry and Polk counties. It is not alleged that any of the ballots were in fact defective, rather it is contended that since the return envelopes containing the ballots cast by the voters were not preserved by the election officials as required by Fla. Stat. § 101.68(1), F.S.A., thus defeating any judicial review of the ballots, then all the ballots should be thrown out. But even if we agreed with this contention and required all the ballots to be thrown out, it would not necessitate the invalidation of all the absentee ballots cast, even though the number (429) would be more than enough to change the result of the election. The general rule is that where the number of invalid absentee ballots is more than enough to change the result of the election, then the election shall be determined solely upon the basis of the machine vote. Frink, supra. The reason for the rule is that since all the ballots have been commingled and it is impossible to distinguish the good ballots from the bad, because all ballots are required by law to be unidentifiable, then in fairness all the ballots must be thrown out. In other words, it is impossible to tell for whom the invalid ballots were cast since they were commingled with the valid ballots. The rule is not applicable here because the outer envelopes for all of the absentee ballots in these three counties were lost. Therefore, assuming that all the ballots were invalid due to the missing envelopes, there is no problem with distinguishing the good ballots from the bad because they all would be bad. Therefore, even if we invalidated all 429 ballots because of missing envelopes, we would only be required to reduce the total number of votes cast for petitioner and respondent rather than throw out all the absentee ballots cast. These 429 have not been commingled with ballots from other counties. The result would be that the 292 votes Boardman received in those three counties would be subtracted from his total and the 137 votes Esteva received from those three counties would also be deducted from his total, still leaving Boardman with an overall majority of 94 votes.
As to the actual validity of the ballots whose return envelopes are missing, we first point out that as a general rule elected officials are presumed to perform their duties in a proper and lawful manner in the absence of a sufficient showing to the contrary, City of Miami Beach v. Kaiser, 213 So.2d 449, 453 (Fla.App.3d, 1958), and also that there is a presumption that returns certified by election officials are presumed to be correct. Burke v. Beasley, 75 So.2d 7 (Fla. 1954). This is because the canvassing of returns, including absentee ballots, is vested in canvassing boards in the respective counties who make judgments on the validity of the ballots. When the voters have done all that the statute has required them to do, they will not be disfranchised solely on the basis of the failure of the election officials to observe directory statutory instructions. Titus v. Peacock, supra. It is not contended by respondent that the absentee ballots in question were illegally cast or that they were cast by voters who were unqualified to vote absentee. The burden is clearly on the contestor to establish that the ballots have been irregularly cast. Burke, supra. There is nothing in the record to indicate that the absentee ballots in question were not cast by qualified registered voters who were entitled to vote absentee, therefore, the presumption of the correctness of the election officials' returns stands.[5]
*269 Turning to the question whether the procedure utilized in canvassing and counting the absentee ballots in Hillsborough County violates the requirement of secrecy, thus invalidating all the absentee ballots cast in that county, we hold that it does not. It has long been recognized in this State that by voting absentee the elector waives the secrecy of his ballot. Hutchins, supra. Likewise in McDonald v. Miller, supra, we held that the privilege of secrecy is personal to the voter, and if he so desires may waive it. Although we do not suggest that there has been a personal waiver of an individual voter's right to secrecy here, we make the following two observations. First, it is not contended that the privilege of secrecy was violated in the actual casting of the ballots by the voters. Rather, it is contended that the order entered by the Hillsborough County Circuit Court in Levine, et al. v. Falsone, et al., Case No. 213299, opinion filed October 7, 1972, requiring the Hillsborough County Canvassing Board to assign a number to each absentee elector for purposes of maintaining the integrity of the ballots and votes for purposes of judicial review, which order was entered subsequent to the actual casting of the absentee ballots on October 3, 1972, enabled the election officials to determine which voter voted for which candidate. We emphasize that it has not been contended that the voters were in any way influenced in their voting by the order in question or that they even were aware of it. Nor is there any allegation that a violation of secrecy has actually occurred. This was nothing more than an honest attempt to preserve the integrity of the ballot in case the election was contested. Our second observation is that we are not at all convinced that either petitioner or respondent has standing to raise the issue of violation of secrecy of the ballot. Being personal to the voter, the right of secrecy may be waived by the voter and it would appear that the voter himself is the only party who has standing to protest a violation of the right to vote in secret. We therefore conclude that the absentee ballots cast in Hillsborough County were not invalidated by reason of a violation of the right of secrecy of the ballot.
In summary, we hold that the primary consideration in an election contest is whether the will of the people has been effected. In determining the effect of irregularities on the validity of absentee ballots cast, the following factors shall be considered:
(a) the presence or absence of fraud, gross negligence, or intentional wrongdoing;
(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.
The underlying concern of the election officials in making the initial determination as to the validity of the absentee ballots is whether they were cast by qualified, registered voters, who were entitled to vote absentee and who did so in a proper manner. The substantial compliance test used by the *270 trial judge comports with our conclusion that strict compliance with the statutory requirements for absentee balloting is not required to validate the ballots. Since the trial court found only 88 ballots to be invalid, petitioner Edward F. Boardman is hereby declared the winner of the October 3, 1972, election for the Second District Court of Appeal by a total of 161 votes.
Therefore, the decision of the District Court of Appeal, First District, is quashed. This cause is remanded to the District Court of Appeal with instructions to reinstate and affirm the judgment of the trial court.
It is so ordered.
ROBERTS, J., and CHAPPELL, Circuit Judge, concur.
OVERTON, J., concurs with an opinion.
ENGLAND, J., concurs specially to conclusion with an opinion.
WILLIAMS, Circuit Judge, concurs specially with an opinion.
OVERTON, Justice (concurring).
I have been strict in the exercise of our conflict jurisdiction. A reading of the election contest cases concerning absentee ballots reveals a maze of confusing doctrines and rules. There are cases to sustain the position of both sides. The following are cases which may be asserted to sustain the validity of the critical absentee ballots: McDonald v. Miller, 90 So.2d 124 (Fla. 1956); Burke v. Beasley, 75 So.2d 7 (Fla. 1954); Jolley v. Whatley, 60 So.2d 762 (Fla. 1952); State ex rel. Hutchins v. Tucker, 106 Fla. 905, 143 So. 754 (1932). On the other hand, the following cases may be asserted to invalidate the absentee ballots: Parra v. Harvey, 89 So.2d 870 (Fla. 1956); Wood v. Diefenbach, 81 So.2d 777 (Fla. 1955); Griffin v. Knoth, 67 So.2d 431 (Fla. 1953); Frink v. State ex rel. Turk, 35 So.2d 10 (Fla. 1948); State ex rel. Whitley v. Rinehart, 140 Fla. 645, 192 So. 819 (1940); Spradley v. Bailey, 292 So.2d 27 (Fla.App.1st 1974); Papy v. Englander, 267 So.2d 111 (Fla.App.3d 1972).
Our role in conflict jurisdiction is to stabilize the law by a review of decisions which form patently irreconcilable precedents. Florida Power & Light Co. v. Bell, 113 So.2d 697 (Fla. 1959). The aforementioned cases are impossible to reconcile.
In my opinion, we also have jurisdiction because the instant decision of the District Court accepts earlier decisions of this Court as controlling precedent in a situation which is materially at variance with the instant case. See McBurnette v. Playground Equipment Corp., 137 So.2d 563 (Fla. 1962). The instant case concerns an 18-county election. The District Court decision invalidates all absentee ballots in all 18 counties by applying the rule that: "... [W]here the number of illegal absentee ballots cast is sufficient to change the result of an election, none of the absentee ballots cast in the election will be accepted and counted... ."[1]
In all the cases cited for this rule, invalid ballots were commingled with valid absentee ballots and the elections concerned only a single county or municipality. Neither of these facts is present in the instant case. In my opinion, this is a material variance.
The strict application of the District Court's decision could have a devastating effect on the inclusion of absentee ballots in close statewide races. I am deeply concerned, as is Judge Williams, that the practical application of the District Court's decision would void all absentee ballots in every close multi-county election which had the result changed by absentee ballots. A *271 candidate who won a close election on the machine vote but lost when absentee ballots were counted would only have to find defective election procedures in one or two counties involving enough total ballots to change the result in order to void all absentee ballots.
In conclusion, I agree with the trial judge that common sense and a reasonable application of the statute requirements in absentee ballots must be applied. It is important to recognize that in the instant case there is no allegation or suggestion of any fraud, corruption, or other intentional misconduct on the part of either candidate or the election officials in the several counties and districts involved. Purity of the ballot must be maintained, and opportunities for fraud and interference with the ballot must be discouraged. Strict application of the rule adopted by the District Court might well encourage absentee ballot interference.
I concur in the majority opinion.
ENGLAND, Justice (concurring specially):
I agree with Chief Justice Adkins that the trial court's judgment should be affirmed.
WILLIAMS, Circuit Judge (concurring specially).
In the consideration of this cause, I was concerned to find that the most recent decisions in Florida appeared to resolve the law on questioned absentee ballots in favor of strict compliance of the statutes, even on some insignificant details, and further in favor of discounting all absentee ballots where the number of illegal ballots are sufficient to change an election, even in a large multi-county or multi-district election where the various counties' ballots are kept separately and not commingled. I agree with the observations of the trial judge in this case wherein he observed in Paragraph 5 of his judgment that if the pronouncements in the Woods and Parra cases are to be applied without regard to the particular facts in those cases it is doubtful that any close election which is decided by absentee votes in an area equal to or larger than the Second District could be sustained.
I am particularly concerned that if the decision of the First District Court of Appeal in this case were to stand as the law of Florida in elections, corruption might be encouraged. Fortunately, in this case there is no hint of corruption or evil intent on the part of any one involved in this case. I only speak of possibilities in the future. Almost all elections, to all intents and purposes, are decided by the machine vote which is usually counted on the evening of the election or in the early hours of the following morning. The absentee ballots are not counted until at least many hours after the machine vote has been counted and announced. Therefore, the counting of the absentee ballots usually becomes a mere formality. Only in close elections may the absentee ballots make the difference in the election results, and then as a kind of proceeding after the fact of the "regular" election.
Let us consider a hypothetical situation as follows: in which there is an election for a judgeship in a district or circuit encompassing several counties; in which an election worker or official is involved in processing or counting votes; in which such official or worker is interested in one of the candidates in the election either through friendship, politics, or other close relationship; in which such official or worker's candidate appears to be the winner by a close vote after the count of the precinct or machine ballots. In such a situation it would appear to me that it might be very easy for such an official or worker to immediately destroy a sufficient number of ballots, destroy the outer envelopes of a sufficient number of ballots, or do any one of a number of acts which would involve a number of absentee ballots; such number comprising more than *272 the margin by which his favorite candidate has apparently won the machine count. Thereby, without even knowing the contents of the ballots or caring, he immediately makes certain that his candidate has won the election. He has thus, personally and at very little risk, disenfranchised all persons who voted by absentee ballots and has thereby possibly himself decided the outcome of the election. It is bad enough that one such person is able to disenfranchise the voters in his particular county, but being able thereby to disenfranchise the voters in all of the counties in the election is unconscionable.
In the case before us there were 3,389 absentee ballots counted and returned by the Canvassing Boards of 18 counties. In each of 4 counties there were enough absentee ballots that, if invalidated, could invalidate all absentee ballots in all the counties, under the decision of the District Court of Appeal, and some prior decisions upon which its ruling was based. Such interpretation of law should be repudiated by this Court.
On one point I disagree with the trial judge and agree with the District Court of Appeal. I am not in favor of going too far in the substantial compliance application. Certain of the statutory requirements must be complied with and to be too generous in the application of the substantial compliance theory would again encourage corruption by inclusion of bad ballots. In adddition to the 88 ballots found to be illegal by the trial court, I would agree with the District Court of Appeal, that all of those ballots in which the reason for voting absentee was not specifically indicated either on the application or on the return envelope should be barred.
Such a requirement goes to the very eligibility of the voter to cast an absentee ballot, and, if deemed reasonable to the legislature, should not be vetoed by us, which we in effect would do by overlooking the omission of the voter. These ballots add up to at most 95. (The record does not indicate whether or not the reason for voting absentee was indicated on one but not the other. It would be sufficient if the reasons were indicated in either place.)
For reasons stated by the trial judge and by Justice Adkins in his Opinion, I agree that the 453 absentee ballots of Hillsborough County and the 429 absentee ballots from Glades, Hendry and Polk Counties, are valid. The substantial compliance rule is even more applicable to actions of public officials than to the errors or omissions of the voters themselves. Voters should not be disenfranchised by the actions of public officials after proper count and certification and before a contest of the election. The improper ruling of the court in Hillsborough County which resulted in a breach of the secrecy of the ballots should not disenfranchise the electors of Hillsborough County even though instigated by one of the parties who, for ought that appears in the record, did so in good faith, in attempting to protect his interest and to preserve a true count of ballots.
NOTES
[1] It is interesting to note that Fla. Stat. § 101.07, 1941, F.S.A., strictly interpreted in Frink, was amended in the legislative session immediately following our rendering of Frink. See § 1, Ch. 25385, 1949 Laws of Florida. At the time Frink was decided § 101.07 required the county clerks to furnish a ballot which, inter alia, included an oath to be taken and subscribed to by the elector. The oath was spelled out in the text of the statute. The amended version, § 1, Ch. 25385, 1949, in addition to other changes in the statute, prescribed a new form of oath for the application. However, instead of requiring the specific oath prescribed in the statute, as we determined was the legislative intent in Frink, the new version simply required the execution of an oath in substantially the same form prescribed therein. This part of the statute remains unchanged.
[2] Jolley v. Whatley, 60 So.2d 762 (Fla. 1952); Griffith v. Knoth, 67 So.2d 431 (Fla. 1953); Wood v. Diefenbach, 81 So.2d 777 (Fla. 1955); Parra v. Harvey, 89 So.2d 870 (Fla. 1956); McDonald v. Miller, 90 So.2d 124 (Fla. 1956).
[3] In Titus, we cited 9 R.C.L. § 102, pp. 1093-1095, as well as Hutchins, for support of the exception we mention here. Although the cited paragraph does not refer to absentee ballots or statutes, it does make the pertinent observation that:

"In short, a fair election and honest return should be considered as paramount in importance to minor requirements which prescribe the formal steps to reach that end, and the law should be so construed as to remedy the evil against which its provisions are directed and at the same time not to disenfranchise voters further than is necessary to attain that object." 9 R.C.L. § 102, pp. 1093-1095.
[4] Although not controlling here, we note that in the Legislative session subsequent to this contested election, Fla. Stat. § 101.67, F.S.A., was amended in two interesting particulars. First, the elector is no longer required to restate on the elector's certificate his reason for voting absentee, although the elector must state that he or she is voting absentee for the reason stated in the application for absentee ballot. Second, no longer is the elector required to fill in the number of the precinct in which he or she is registered to vote on the elector's certificate. That is now the duty of the election official. At the very least the Legislature has by these amendments recognized the repetitiousness of the information appearing on the two forms for the application and elector's certificate. We feel that the Legislature has also recognized that certain items previously required to be complied with are not essential to the sanctity of the ballot.
[5] We agree with the trial court's observations that:

"... The election process is subject to legislative prescription and constitutional command and is committed to the executive branch of government through duly designated officials all charged with specific duties. The canvassing of returns, including absentee ballots, is vested in canvassing boards in the respective counties who make judgments on the validity of the ballots. Those judgments are entitled to be regarded by the courts as presumptively correct and if rational and not clearly outside legal requirements should be upheld rather than substituted by the impression a particular judge or panel of judges might deem more appropriate. It is certainly the intent of the constitution and the legislature that the results of elections are to be efficiently, honestly and promptly ascertained by election officials to whom some latitude of judgment is accorded, and that courts are to overturn such determinations only for compelling reasons when there are clear, substantial departures from essential requirements of law. Such is not the case here and this Court deems action by it to change the result which the proper officers have reached would be meddlesome interference not sanctioned by proper judicial functions." Final Summary Judgment, Esteva v. Hindman, Case No. 72-1481, opinion filed October 2, 1973, Second Judicial Circuit.
[1] Esteva v. Hindman, 299 So.2d 633, 637 (Fla.App.1st 1974).