707 So.2d 720 (1998)
Gus BECKSTROM, Appellant,
v.
VOLUSIA COUNTY CANVASSING BOARD and Robert L. Vogel, Appellees.
No. 91642.
Supreme Court of Florida.
March 19, 1998.
*721 Donald W. Weidner and Jeanine H. Coris of Weidner & Wortelboer, Jacksonville, for Appellant.
Daniel D. Eckert, Volusia County Attorney, and James R. Clayton, DeLand, for Appellees.
WELLS, Justice.
We have for review a final judgment of the Circuit Court of the Seventh Judicial Circuit in Volusia County, which judgment has been certified by the Fifth District Court of Appeal as presenting an issue of great public importance, having a great effect on the proper administration of justice throughout the state, and requiring immediate resolution by this Court. We have jurisdiction. Art. V, § 3(b)(5), Fla. Const.
This case arises out of the November 5, 1996, Volusia County election in which appellant Gus Beckstrom was an unsuccessful candidate for sheriff. On November 8, 1996, pursuant to section 102.166(11), Florida Statutes (1995),[1] appellant filed in the circuit *722 court a protest of the election returns. The protest was based on allegations of fraud in the counting of absentee ballots by the staff of the Volusia County Supervisor of Elections. County election officials had tabulated the votes, and appellee Volusia County Canvassing Board[2] had subsequently certified the result to the Department of State, which declared incumbent Sheriff Robert L. Vogel, Jr. to be the winner of the election.
One month after filing the initial protest, appellant moved the court to order a manual re-count of the absentee ballots. The court granted the motion, and the clerk of the circuit court conducted a re-count, which was observed by representatives for both candidates. The clerk's re-count revealed that, despite miscounts in the initial ballot count, Vogel was the winner of the election. The re-count showed 79,902 total votes for Vogel and 77,012 total votes for Beckstrom.[3]
On the same day appellant filed his motion for a re-count, he filed a second amended protest and complaint, again alleging fraud and adding allegations of substantial failure on the part of Volusia County election officials to comply with the requirements of the election laws pertaining to absentee ballots. The absentee ballots were of crucial importance in the sheriff's election because, although appellant received more votes than Vogel in the precincts, Vogel received a sufficient majority in the absentee votes to overcome appellant's precinct vote margin of victory. Appellant asked the court to declare all of the absentee votes to be invalid and to declare him the winner based on the precinct vote alone. Appellant argued that absentee ballots were tampered with and modified in violation of section 101.5614(5), Florida Statutes (1995),[4] in that at least 6500 absentee ballots contained votes which were marked over with a black felt-tip marker; and an additional 1000 absentee ballots were similarly marked, but it was impossible to determine whether they were marked over or newly marked.[5] Appellant alleged that this *723 process of re-marking with black markers was tainted with potential fraud.[6] The circuit court held a nonjury trial in which testimony was presented for seven days and argument of counsel was presented for one day.
The trial court thereafter entered a detailed final judgment which contained a combination of findings of fact and conclusions of law. The trial court determined that the key issue in the election contest was the re-marking procedure used by election officials on many of the absentee ballots so as to enable those ballots to be counted by an electronic scanner. The trial court found that this re-marking procedure was not in substantial compliance with section 101.5614(5), Florida Statutes (1995), because the procedure provided no reasonable substitute means of verification of the results of the election. The trial court found this noncompliance with procedures mandated by the statute to be gross negligence. The trial court found that this noncompliance created an opportunity for fraud. However, the trial court found that, although there was an opportunity for fraud, no fraud was proven.
The trial court applied this Court's decision in Boardman v. Esteva, 323 So.2d 259 (Fla.1975), to these factual findings. The trial court concluded that there was a "full and fair expression of the will of the people. Vogel won it." The court entered judgment for the defendants, thereby affirming the election of Sheriff Vogel.
Beckstrom appealed this final judgment to the Fifth District Court of Appeal. In an order certifying the case to this Court, the Fifth District stated:
The trial judge ruled that the Canvassing Board acted with gross negligence but that there was no evidence of fraud in the process; thus the election was valid. Relying upon the analysis in Boardman v. Esteva, the trial court held that courts should not decide elections but should condone a "certain level of incompetence" by election officials, unless the level of incompetence, negligence or error reaches an intolerable level. Although the court found that the re-marking process used by election officials in this case irreparably harmed the sanctity and integrity of the election, attempting to apply Boardman, the trial court found a level of incompetence here acceptable. Further, the court found "there [was] a full and fair expression of the will of the people ..." *724 and that the will of the people was not affected by the negligence of the Canvassing Board. The trial court also found substantial compliance with absentee voting laws sufficient to make the ballots legal. The trial court then held there was an accurate count of the absentee vote and dismissed the election protest with prejudice.
It is clear that the controlling authority in Florida is the Boardman decision and that, in Boardman, the supreme court intended to circumscribe the courts' involvement in the electoral process. The lower court suggested that since it was decided in 1975, the Boardman decision has become a "license for lawlessness by election officials." Boardman offers no guidance concerning the kind or degree of negligence that will warrant judicial intervention, absent fraud. This Court has found no case wherein the trial court has made a finding of gross negligence by a Canvassing Board and many technical violations of Chapter 102 by the supervisor of elections, yet validated the election. It appears that the validity of an election where there has been a finding of gross negligence, but no fraud, in the handling of absentee ballots and the use of the automatic tabulating equipment that is currently used in many counties in this state is an issue of great public importance whose resolution is required by the high court in light of the rule of Boardman v. Esteva.
(Citation omitted.)
In this appeal, appellant raises the following four claims: (1) that the trial court erred as a matter of law when it refused to invalidate the absentee ballots; (2) that the trial court erred when it concluded that there was no evidence of fraud in the absentee ballot process; (3) that the trial court erred in concluding that there was an accurate count of the votes; and (4) that the trial court erred in failing to invalidate the absentee returns after declaring 885 ballots illegal because they did not contain either voter signatures, witness signatures, or witness addresses. In respect to issues three and four, we conclude from our review of the record that the trial court did not abuse its discretion in the final judgment with respect to those issues. We therefore affirm the final judgment as to those issues but do not find that they merit discussion.
Appellant's first and second issues encompass the issue certified to us by the district court which focuses upon our decision in Boardman. We begin our analysis of this issue by reiterating the statement of principle which we made in analyzing the Boardman election contest:
[T]he real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of, by and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or we risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.
Boardman, 323 So.2d at 263.
In Boardman, we followed this statement with the history of cases in which we had addressed questions concerning compliance with election statutes. We then upheld the challenged election, in which an unsuccessful candidate for a judicial seat on the Second District Court of Appeal sought to be declared the winner, based solely on the precinct vote count because of alleged irregularities in the absentee ballot count. Boardman, 323 So.2d at 261. In upholding the election, we stated:
[R]ealizing as we do that strict compliance has been required by this Court in other *725 cases, we now recede from that rule [and hold] to the effect that substantial compliance with the absentee voting laws is all that is required to give legality to the ballot.
Id. at 264.
We set forth in Boardman the following factors to be considered in determining the effect of absentee ballot irregularities:
(a) the presence or absence of fraud, gross negligence, or intentional wrongdoing;
(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.
Id. at 269 (emphasis added).
The Fifth District and appellant question whether, under our holding in Boardman, the trial court could find gross negligence but no fraud and still sustain the election result. We recognize that underlying this question is the direct fundamental issue as to whether a trial court can sustain a certified election result after the court has found substantial noncompliance with the election statutes, but the court has also found that this result reflects the will of the people despite the substantial noncompliance. We answer the question in the affirmative.
We stress, however, that we are not holding that a court lacks authority to void an election if the court has found substantial unintentional failure to comply with statutory election procedures. To the contrary, if a court finds substantial noncompliance with statutory election procedures and also makes a factual determination that reasonable doubt exists as to whether a certified election expressed the will of the voters, then the court in an election contest brought pursuant to section 102.168, Florida Statutes (1997), is to void the contested election even in the absence of fraud or intentional wrongdoing.
We hold that there is a necessary distinction between an election contest with a judicial determination of fraud and an election contest with a judicial determination of substantial noncompliance with statutory election procedures, even if the noncompliance is determined to be a result of gross negligence by election officials. Such a distinction is required in order to respect the fundamental principle upon which we based our decision in Boardman. As the trial court in this case recognized, the essence of our Boardman decision is that a trial court's factual determination that a contested certified election reliably reflects the will of the voters outweighs the court's determination of unintentional wrongdoing by election officials in order to allow the real parties in interestthe votersto prevail. By unintentional wrongdoing, we mean noncompliance with statutorily mandated election procedures in situations in which the noncompliance results from incompetence, lack of care, or, as we find occurred in this election, the election officials' erroneous understanding of the statutory requirements. In sum, we hold that even in a situation in which a trial court finds substantial noncompliance caused by unintentional wrongdoing as we have defined it, the court is to void the election only if it finds that the substantial noncompliance resulted in doubt as to whether a certified election reflected the will of the voters.
In direct answer to the district court's request for "guidance concerning the kind or degree of negligence that will warrant judicial intervention, absent fraud," we clarify that the term gross negligence as used in Boardman is not, as in a tort action, a measurement of the degree of care by election officials. Rather, in this context, gross negligence means negligence that is so pervasive that it thwarts the will of the people.
We expressly state that our decision in Boardman is not to be read as condoning anything less than strict adherence by election officials to the statutorily mandated election procedures. Such adherence is vital to safeguarding our representative form of government, which directly depends upon election officials' faithful performance of their duties. Neither Boardman nor this case concerns potential sanctions for election officials who fail to faithfully perform their duties. It is for the legislature to specify what sanction should be available for enforcement against election officials who fail to *726 faithfully perform their duties. We simply conclude that the court should not frustrate the will of the voters if the failure to perform official election duties is unintentional wrongdoing and the will of the voters can be determined.
Turning to this issue in this case, we agree with the trial court that the Volusia County process of re-marking ballots was not in substantial compliance with section 101.5614(5), Florida Statutes (1995), even though the process was widely used, recommended by the manufacturer's representative, and approved by the state Division of Elections. To comply with the statute, ballots which were defectively marked and thus unreadable by the scanner had to be hand-counted or duplicated before being re-marked so that the original ballot marking could be preserved for verification. We agree with the trial court that the re-marking process was an opportunity for fraud. Our review of the record of evidence presented at the nonjury trial causes us to conclude, however, that the trial court was within its discretion in determining that, although the re-marking process was an opportunity for fraud, fraud did not occur. The trial court's specific findings were:
There are several allegations or assertions of fraud. The first is that somebody overmarked an undervote; basically, placed a mark on a blank ballot. I am not persuaded that that happened as a result of fraud because of the undervote statistics. The undervote statistics are not disputed and we have a greater undervote in the overmarked ballots than we had in the good pencil ballots. The difference in the undervote was really quite marked. We would expect statistical evidence to be the opposite if this had been happening in a systematic manner.
The next would be to overvote a Beckstrom vote by simply deliberately marking the Vogel oval in addition to the Beckstrom oval thereby inducing the reader to cancel the vote. If this had occurred, the overvote statistic would certainly be far greater than it is. It is minuscule at this time and I am not persuaded that this occurred on any systematic basis.
The next is the replacement of ballots cast by electors with the new ballots prepared through fraud. There is no inferenceno evidence from which an inference can be drawn that this occurred.
The next method would have been simple erasure, simply erase the Beckstrom ballot and pencil in a Vogel ballot. The ballots were examined. The examiners looked at them and did not pull any out and point the finger of guilt at erasures. I did not notice any significant level of erasures in the absentee ballots. Many ballots were returned in very messy condition. I can draw no inference from their condition that there were erasures that were evident. There being no evidence of that, I am not persuaded that it occurred.
The next is simply not marking over a Beckstrom vote, simply leaving that as one that the reader did not read and marking over other races on the ballot. This occurred on some occasions during the course of the election. I am not persuaded it occurred on a systematic basis. I am more comfortable with this thinking because the clerk's count of the votes would have detected this and counted all of those votes, so it could not have caused any harm.
I do not think that the machines rejected the ballots on a random basis. The statisticians agreed that a random selection is one in which each member of the class has an equal chance of selection. That was not the case here. Because of the nature of the automatic tabulating equipment, a ballot that had been improperly marked had a greater chance of selection than a ballot that was not improperly marked. So I do not find this to have a random selection of ballots.
The twenty-five ballots that were selected by the plaintiff for examination and as evidence of the interference of fraud lend themselves to an inference of fraud, but I find that they lend themselves equally to an inference of negligence in the overmarking process. I have examined large numbers of these ballots and these twenty-five were not the only ballots that were marked incorrectly. There were numerous *727 ballots that had not been selected for presentation that were also marked incorrectly and there are incorrect markings on virtually every single race. I have examined ballots in which the back side of the ballot was not marked at all or numerous ballots inconsistently mismarked. I cannot draw an inference of fraud from that. I can, however, draw an inference of negligence in the marking process. I choose to draw the latter inference.
We approve the trial court's findings in respect to fraud. We construe the trial court's finding of gross negligence in this instance to be a measurement of the culpability of the election officials but not a finding that the election failed to express the will of the voters. Therefore, we conclude that the trial court was within its discretion in determining from the evidence that the election was a "full and fair expression of the will of the people. Vogel won it."
Based upon the foregoing analysis and upon our review of the record, we find no basis for reversal of the trial court's final judgment based upon appellant's issues one and two. Therefore, we affirm the final judgment of the trial court. We do disapprove from the final judgment the statement: "I do not have jurisdiction to set aside this election." The trial court clearly had jurisdiction to consider and decide the issue presented by appellant's complaint in this election contest pursuant to sections 102.166(11) and 102.168, Florida Statutes (1995). Thus, the correct statement is that the trial court found no factual basis for requiring that the election be set aside. Accordingly, we affirm the trial court's decision.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW, HARDING and ANSTEAD, JJ., and GRIMES, Senior Justice, concur.
NOTES
[1] Section 102.166(11), Florida Statutes (1995), provides in relevant part:

Any candidate for nomination or election, or any elector qualified to vote in the election related to such candidacy, shall have the right to protest the returns of the election or the practices attendant thereto as being fraudulent by presenting to any circuit judge of the circuit wherein such fraud is alleged to have occurred a sworn, written protest.
[2] A county canvassing board is composed of the county supervisor of elections, a county court judge, and the chair of the board of county commissioners. § 102.141(1), Fla. Stat. (1995).
[3] According to the vote counts initially tabulated by the elections supervisor's staff and certified by the canvassing board, Beckstrom received 52 percent of the precinct vote but just 40 percent of the absentee vote. According to the re-count, Beckstrom received 41 percent of the uncontested absentee votes and 37 percent of the contested overmarked absentee votes. Thus, Beckstrom received close to 40 percent of the total absentee votes in both the initial count and in the re-count.

As appellant points out, the difference between the percentage of Vogel's precinct vote total and the percentage of his absentee vote total was 11 percentage points. However, we note that Vogel was not alone in receiving a significantly larger percentage of absentee votes than percentage of precinct votes. In the United States presidential election held the same day, another Republican Party candidate, Dole, showed a 9-percent margin between his percentage of absentee votes and percentage of precinct votes, and Republican Party congressional candidate Fields had a 15-percent margin between absentee and precinct vote percentage totals. A statistical expert who testified on behalf of Volusia County presented demographic explanations for the absentee voting percentage discrepancies.
[4] Section 101.5614(5), Florida Statutes (1995), provides in relevant part:

If any ballot card ... is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy shall be made of the damaged ballot card in the presence of witnesses and substituted for the damaged ballot.... If any paper ballot is damaged or defective so that it cannot be counted properly by the automatic tabulating equipment, the ballot shall be counted manually at the counting center by the canvassing board.... After duplicating a ballot, the defective ballot shall be placed in an envelope provided for that purpose, and the duplicate ballot shall be tallied with the other ballots for that precinct.
We construe "defective ballot" to include a ballot which is marked in a manner such that it cannot be read by a scanner.
[5] The method of counting absentee ballots used in Volusia County for the 1996 election was called "Accu-Vote," which is an optical scan tabulating system. Five other Florida counties also used this type of optical scan system. In using this system, absentee voters were instructed to mark their ballots with number two pencils. The optical scanner rejected ballots which were marked with instruments other than number two pencils. Election supervisors in three other counties (Leon, Putnam, and Monroe Counties) using this type of optical scanner testified that their procedures in respect to rejected ballots was the same as the procedure used in Volusia County. The procedure was to use a black felt-tip marker to re-mark ballots that the scanner could not read. The re-mark was placed on top of the voter's original mark, making it possible for the scanner to then record the vote. This was the procedure recommended by the manufacturer's representative of the company that sold the optical scanners to Volusia County. The Supervisor of Elections for Leon County testified that this re-marking procedure was approved for use in processing absentee ballots by the Division of Elections of the Department of State.
[6] Other vote-counting irregularities alleged by appellant included appellant's claims that absentee ballots were left unattended and accessible at the office of the elections supervisor; that absentee ballots were opened by various persons outside the presence of any member of the canvassing board; that sheriff's deputies had access to and participated in the opening of absentee ballots; that individuals who were not employees of the elections supervisor participated in the opening of absentee ballots; that doors of the elections office were locked and not open to the public when absentee ballots were being opened; that election officials began processing absentee ballots through electronic tabulating equipment at least four days prior to the election; that prior to opening absentee ballot mailing envelopes, election officials failed to compare the signature of the voter on each voter's certificate with the signature of the voter as shown in registration records; that election officials accepted as many as 1463 absentee ballots which were illegal because the voter certificates accompanying them lacked either the voter's signature or the signature and/or address of the witness; that a number of absentee ballots remained absent and unaccounted for; that election officials failed to properly preserve all absentee ballots for which duplicates were made, and a number of duplicate ballots were unaccounted for; that several voters who requested absentee ballots but who had not received them in time for the election were denied the right to vote in person; and that some absentee ballots were changed and/or misplaced, lost, or otherwise not counted as a result of fraud, gross negligence, or intentional wrongdoing. Appellant claimed that these alleged irregularities violated subsections of chapter 101, Florida Statutes (1995) (providing requirements for voting methods and procedures), and chapter 102, Florida Statutes (1995) (providing requirements for conducting elections and ascertaining the results).