437 So.2d 737 (1983)
Jack L. McLEAN, Jr., Appellant,
v.
Carol BELLAMY, James R. Ford, Hurley W. Rudd, Kent Springgs, and Sam Teague, As and Constituting the Canvassing Board of Tallahassee, Florida, and W. Judd Chapman, Appellees.
Nos. AN-219, AS-53.
District Court of Appeal of Florida, First District.
September 8, 1983.
*739 Howell L. Ferguson of Ferguson & Sherill and Roosevelt Randolph of Knowles, Randolph & Cooper, Tallahassee, for appellant.
*740 Bryan W. Henry, James R. English, and Martin W. Proctor of Henry, Buchanan, Mick & English, Tallahassee, for appellees Bellamy, et al; and Roy T. Rhodes and William L. Grossenbacher of Horne, Rhodes, Jaffry & Horne, Tallahassee, for appellee Chapman.
P. Kevin Davey of Douglass, Davey, Cooper & Coppins, Tallahassee, for appellees/intervenors Dasher.
NIMMONS, Judge.
This is an election contest involving a seat on the Tallahassee City Commission, appellee Judd Chapman having been declared the winner in the February 23, 1982, election over appellant Jack L. McLean, Jr. McLean appeals from an adverse summary judgment.[1] Although McLean received 116 machine ballots more than Chapman (7,932 to 7,816), Chapman received 205 absentee ballots more than McLean (281 to 76). This contest involves the validity of 293 of the absentee ballots. Although the City Commission, sitting as the duly constituted canvassing board, accepted and counted 357 absentee ballots, 64 ballots were not challenged by McLean.
McLean filed suit in the Circuit Court in Leon County seeking to have the court declare him winner on the basis of the machine votes only. McLean contended that all of the absentee ballots must be thrown out because at least 90 of the ballots (90 being the numerical margin of Chapman's victory) were invalid. The general rule is that where the number of invalid absentee ballots is more than enough to change the result of the election, the machine votes shall solely determine the election results. Boardman v. Esteva, 323 So.2d 259, 268 (Fla. 1976).
Several state election code[2] requirements were alleged to have been violated with respect to the handling of absentee ballots by city election officials. The various categories of allegedly tainted absentee ballots may be summarized as follows: (1) Unrequested Ballots  81 absentee ballots were cast in the runoff election which had been automatically (without request) sent to those electors who had voted absentee in the primary election; there were 89 persons who had received absentee ballots for the primary but who did not cast such ballots and were, therefore, not sent an absentee ballot for the runoff election; (2) Improperly Witnessed Ballots  There were 17 absentee ballots in which one of the two witnesses who signed the ballot envelope was not physically present when the elector signed such envelope; (3) Non-conforming Voter Certification on Envelopes  In each of the 293 contested absentee ballots, the envelope containing the ballot failed to specify the various statutory grounds entitling an elector to vote absentee; (4) Ballot Distribution to Unauthorized Persons  Approximately 32 absentee ballot forms were released by election officials to third persons requesting ballots for electors without written authorization from the elector.
As in previous years, the office of the City Auditor-Clerk was responsible for the city election process in 1982. For the previous thirteen years, Mr. Wilbur Gramling of the Auditor-Clerk's Office had performed the actual supervision of city elections, including the handling of absentee ballots. Due to his retirement in 1981, Mr. Herb Seckel, the incumbent Auditor-Clerk, undertook for the first time the direct supervision of the 1982 city elections. In view of his relative inexperience in elections supervision, Seckel sought advice from time to *741 time from others, including Leon County Supervisor of Elections John Sullivan.
Before treating each of the above categories of irregularities, we shall outline those legal principles applicable to a case such as this. We do so by quoting at length from the largely controlling opinion of Justice Adkins in Boardman v. Esteva, supra:
At issue is whether the absentee voting law requires absolute strict compliance with all its provisions, or whether substantial compliance is sufficient to give validity to the ballot.
We first take note that the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people... . By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right. [323 So.2d at 262, 263]
* * * * * *
Assuming that the absentee ballots counted in the election were cast by qualified, registered electors, who were otherwise entitled to vote absentee, notwithstanding the alleged defects, a majority of the voters in the Second District preferred Mr. Boardman over Mr. Esteva in October, 1973. This must not be overlooked. If we are to countenance a different result, one contrary to the apparent will of the people, then we must do so on the basis that the sanctity of the ballot and the integrity of the election were not maintained, and not merely on the theory that the absentee ballots cast were in technical violation of the law. [323 So.2d at 263]
* * * * * *
[R]ealizing as we do that strict compliance has been required by this Court in other cases, we now recede from the rule and hereby reaffirm the rule adopted in [State ex rel. Hutchins v. Tucker, 106 Fla. 905, 143 So. 754 (1932)] to the effect that substantial compliance with the absentee voting laws is all that is required to give legality to the ballot. [323 So.2d at 264]
* * * * * *
In developing a rule regarding how far irregularities in absentee ballots will affect the result of the election, a fundamental inquiry should be whether or not the irregularity complained of has prevented a full, fair and free expression of the public will. Unless the absentee voting laws which have been violated in the casting of the vote expressly declare that the particular act is essential to the validity of the ballot, or that its omission will cause the ballot not to be counted, the statute should be treated as directory, not mandatory, provided such irregularity is not calculated to affect the integrity of the ballot or election. [emphasis in original] [323 So.2d at 265]
* * * * * *
Absolute strict compliance, even with mandatory provisions in every case, however, could reach absurd proportions. [323 So.2d at 265]
* * * * * *
In expanding the privilege of voting to those citizens who may not be able to vote in person on election day, the Florida Legislature has prescribed statutory requirements which are intended to insure that those who vote are qualified and registered to vote and that they do so in a proper manner. There is no magic in the statutory requirements. If they are complied with to the extent that the duly responsible election officials can ascertain that the electors whose votes are being canvassed are qualified and registered to vote, and that they do so in a proper manner, then who can be heard to complain that the statute has not been literally and absolutely complied with? Strict compliance is not some sacred formula *742 nothing short of which can guarantee the purity of the ballot. [323 So.2d at 267]
* * * * * *
When the voters have done all that the statute has required them to do, they will not be disfranchised solely on the basis of the failure of the election officials to observe directory statutory instructions. [323 So.2d at 268]
* * * * * *
In summary, we hold that the primary consideration in an election contest is whether the will of the people has been effected. In determining the effect of irregularities on the validity of absentee ballots cast, the following factors shall be considered:
(a) The presence or absence of fraud, gross negligence, or intentional wrongdoing;
(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the ballot and the integrity of the election.
The underlying concern of the election officials in making the initial determination as to the validity of the absentee ballots is whether they were cast by qualified, registered voters, who were entitled to vote absentee and who did so in a proper manner. [323 So.2d at 269]
After almost one year of the pendency of this suit in the trial court and exhaustive utilization of the available tools for pre-trial discovery, appellant was able to turn up only ten absentee ballots which should not have been counted: three ballots of electors who were not eligible to vote absentee and seven ballots of electors who received unlawful assistance.
We next address the various categories of alleged irregularities upon which appellant relies for his contention that all absentee ballots should be disregarded and that he be declared the winner based upon the machine ballots.

UNREQUESTED BALLOTS
Prior to the February 9, 1982, primary,[3] City Auditor-Clerk Seckel obtained from County Supervisor Sullivan's office a list of electors who had submitted requests to vote absentee. Seckel's office then mailed out and issued absentee ballots for the primary to those on that list plus others who had submitted absentee requests to the City. After the primary, Seckel did not know whether the City should redistribute absentee ballots to all those to whom his office had sent out absentee ballots for the primary or to just those on the absentee list who had voted absentee in the primary. Seckel consulted with Sullivan. Sullivan testified that he thought that Seckel said he was going to mail ballots to everyone on the list regardless of whether they voted absentee in the primary. Sullivan suggested to Seckel that he might want to mail them only to those who voted in the primary. Seckel did not recall Sullivan making any definite recommendation in that respect. In any event, it was determined to mail the absentee ballots for the runoff only to those who had voted absentee in the primary. Of course, we are speaking here only of the absentee ballots which were "automatically" mailed out. In addition, there were numerous other absentee ballots for the runoff issued to those specifically requesting to vote absentee for the runoff.
McLean contends that the unrequested issuance of absentee ballots for the runoff to electors who had voted absentee in the primary was in contravention of the provisions of Section 101.62, Florida Statutes (1981),[4] which basically contemplate the *743 submission of a request by the elector for an absentee ballot before the election officials are authorized to issue such ballot. McLean points to the fact that the appellees conceded that 81 of those who received such unsolicited ballots voted absentee in the runoff.[5] McLean claims this adversely affected him because the absentee voters in the primary preferred Chapman 153 votes to 40 votes for McLean.[6] McLean also points to the fact that, as the parties stipulated, 89 persons who were sent an absentee ballot for the primary did not vote in the primary, were not sent absentee ballots for the runoff and did not vote in the runoff either by absentee ballot or by machine.
A total of 521 absentee ballots were issued for the runoff of which 366 were cast. The canvassing board rejected eight ballots and one ballot did not reflect a vote for either candidate, thus leaving a total of 357 absentee ballots accepted and counted. The breakdown of the absentee votes in the runoff was 281 for Chapman and 76 for McLean.
Section 101.62 does indeed contemplate issuance of an absentee ballot only upon the request of the elector. Nevertheless, appellees assert that the primary and the runoff should be regarded as one election process and that no additional or special request for a runoff ballot is necessary for those to whom the officials properly distributed absentee ballots for the primary. The trial judge agreed with appellees' position in his judgment stating that he "could find no authority to suggest that when a `run-off' election becomes necessary it is to be considered a separate election requiring an application or new indication of a desire to vote absentee." Appellees' assertion that a request for a primary absentee ballot should be regarded as a request for a runoff ballot because there is actually only one election leaves the appellees traveling down a dead end street inasmuch as that theory fails to justify the election officials' failure to send runoff absentee ballots to the 89 who requested and received primary absentee ballots but who failed to cast their ballots in the primary. We need not reach the issue as to whether the trial court correctly ruled that the primary and runoff should be regarded as one election because even viewed as two elections as appellant contends, the failure to conform to the requirements of Section 101.62 are not the kind of irregularities as should result in the court's invalidation of the subject absentee ballots.[7]
Central to the resolution of this issue is the determination of whether the Section 101.62 statutory criteria for issuance of absentee ballots are directory or mandatory. Our examination of Section 101.62 leads us to conclude that its provisions are directory. We are unable to glean from the provisions of that section a legislative *744 intent that the failure to follow the letter of its provisions should result in the invalidation of absentee ballots cast by qualified electors who are also qualified to vote absentee. In 1977, the Legislature, Chapter 77-175, s. 21, Laws of Florida, relaxed some of the former rigidities of Section 101.62 regarding requests for absentee ballots. Formerly, a written application for an absentee ballot on an official application form was required. The statute no longer requires a written application. In fact, an elector is entitled to receive by mail an absentee ballot which he may request by telephone.
In applying the heretofore quoted principles enunciated by the Florida Supreme Court in Boardman v. Esteva, supra, we find no declaration in Section 101.62, implied or explicit, that strict compliance with its provisions is essential to the validity of the ballot or that the failure to strictly follow any of its provisions will cause the ballot not to be counted.[8]
If it is assumed that it was proper for the election officials to mail absentee ballots to those who had requested them for the primary, what about the 89 electors, McLean asks, who received a ballot for the primary but did not receive one for the runoff because they did not vote in the primary? This is a legitimate and troublesome question. We have found no authority which suggests that in such a situation, the proper resolution would be to throw out the absentee ballots cast by qualified electors because of the highly speculative effect of certain electors not having received absentee ballots. Moreover, it is not insignificant that we are dealing here with a group of 89 voters who did not have sufficient interest to vote in the primary, either by casting their absentee ballot or visiting the polls on the day of the primary. Further, it cannot be said that these 89 persons were denied their right to vote. There is no indication that any of them contacted the election office or otherwise complained of not having received a runoff absentee ballot. The inference which McLean suggests that the City's failure to mail absentee ballots to the 89 primary nonvoters somehow skewed the runoff absentee balloting in Chapman's favor is highly speculative and conjectural.
A related point, though not urged at argument, was appellant's complaint regarding the failure to send out, for either the primary or runoff, absentee ballots to overseas military personnel. However, there was no allegation or evidence of the number of such personnel who may have requested to vote absentee and, in the absence thereof, there could be no finding that there was a sufficient number to change the election result. See Potter v. Bolden, 416 So.2d 6 (Fla. 1st DCA 1982).

IMPROPERLY WITNESSED BALLOTS
McLean sought to invalidate the absentee ballots of 17 persons who were patients at the Tallahassee Regional Medical Center for the reason that only one of the two witnesses who signed the ballot envelopes actually saw the elector sign the envelope.
Celeste Hertz, an employee of the hospital, was assigned by the hospital to deliver the absentee election materials to each elector confined to the hospital. Ms. Hertz personally saw each patient mark the ballot, seal the envelope and affix his signature to the mailing envelope. She then signed as a witness and delivered the envelopes to the office of Betty Taylor, the secretary to the director of the hospital. Ms. Taylor signed the envelopes as the second witness. Ms. Taylor testified that John Bramlett of the Auditor-Clerk's Office told her that one witness was sufficient and that she could sign as a second witness "for consistency." In his deposition, Mr. Bramlett stated that he told Ms. Taylor that two *745 witnesses were necessary. Ms. Taylor stated that her purpose in signing the envelope was actually to verify that the elector was a patient in the hospital.
The pertinent statutory provisions do contemplate two witnesses. Section 101.54, Florida Statutes (1981), contains a form of certificate and provides that the certificate utilized "shall be substantially in ... [that] form... ." In the statutory form after the place for the voter's signature, the following appears: "Two Witnesses Eighteen (18) Years or Older" followed by places for two witness' signatures. Section 101.64(2) also provides: "The absent elector and the attesting witnesses shall execute the form on the envelope." Also, Section 101.65, Florida Statutes (1981), provides for an instruction sheet for absentee electors which is required to be substantially in the form set forth in that statute. With respect to witnesses, the form states: "Any two persons 18 years of age or older may serve as attesting witnesses."
Thus, it is apparent that the pertinent statutes call for two witnesses. Does that mean that an absentee ballot in which the second witness did not actually see the elector sign the envelope is void? We think not. No one questions that the 17 hospital patients were qualified electors and entitled to vote absentee. Rejection of the attack on these 17 ballots does not prevent a full, fair and free expression of the will of the people. See Boardman v. Esteva, supra, at page 265. The subject statutes do not declare that the ballot will be invalid if it appears that one of the attesting witnesses did not actually see the elector sign the envelope. The witness requirements should, therefore, be treated as directory, not mandatory, provided that the fact that only one of the two attesting witnesses actually observed the elector's act of signing the envelope is not calculated to affect the integrity of the ballot or election. Clearly, such omission did not have such an effect on these ballots or the election.
Our conclusion regarding this one-witness deficiency might very well be different under pre-Boardman v. Esteva law. Indeed, but for the striking departure from prior law announced in Boardman, we would be persuaded by such cases as Parra v. Harvey, 89 So.2d 870 (Fla. 1956), cited by appellant, to apply a strict construction of these statutory requirements and invalidate these ballots.
McLean asserts that the witness irregularity regarding these 17 ballots should be viewed more severely by reason of the fact that: (1) Ms. Taylor, who signed as the second witness on these ballots was a contributor to Chapman's campaign, and (2) Ms. Taylor testified that Mr. Bramlett told her that one witness was sufficient whereas Bramlett testified that he told her that two witnesses were required. The fact that Ms. Taylor may have been very much a partisan in this election campaign avails McLean nothing with respect to the issue regarding these ballots. There has been no suggestion that her partisanship had any effect on the voting by these 17 electors. She apparently had no communication with any of them prior to their recording their votes on the ballots and she had no knowledge of the candidate favored by these electors when she subsequently signed the sealed envelopes as the second witness. As far as the above-referred conflicting testimony between Bramlett and Taylor, it makes no difference for purposes of our inquiry as to whether Bramlett told Taylor that one or two witnesses were required. We have assumed that the requirement is two and have considered the attack on these 17 ballots in the light of that assumption. Moreover, even if it is assumed that either of them deliberately lied (as opposed to an honest difference in recollection) about what was said in their conversation, the 17 hospital patients were no less qualified to vote absentee and they should not be disfranchised because of any misinformation conveyed by Bramlett to Taylor.
Appellant points to the fact that the canvassing board threw out one absentee ballot because the mailing envelope bore the signature of only one instead of two attesting witnesses. Appellant says that if *746 it was proper for the canvassing board to regard that ballot as invalid, then those which, as later was shown, bore signatures of two witnesses, one of whom did not actually see the elector sign the ballot, should also be regarded as invalid. Appellant misconceives the proper role of the canvassing board. It was not improper for the board to invalidate the absentee ballot which bore only one signature. It was also proper for the board to accept at face value those ballots which bore two signatures. As the Supreme Court stated in Boardman:
[A]s a general rule elected officials are presumed to perform their duties in a proper and lawful manner in the absence of a sufficient showing to the contrary .. . and also that there is a presumption that returns certified by election officials are presumed to be correct [323 So.2d at 268]
* * * * * *
The canvassing of returns, including absentee ballots, is vested in canvassing boards in the respective counties who make judgments on the validity of the ballots. Those judgments are entitled to be regarded by the courts as presumptively correct and if rational and not clearly outside legal requirements should be upheld rather than substituted by the impression a particular judge or panel of judges might deem more appropriate. It is certainly the intent of the constitution and the legislature that the results of elections are to be efficiently, honestly and promptly ascertained by election officials to whom some latitude of judgment is accorded, and that courts are to overturn such determinations only for compelling reasons when there are clear, substantial departures from essential requirements of law. [323 So.2d at 268, f.n. 5]
See also Anderson v. Canvassing and Election Board, 399 So.2d 1021 (Fla. 1st DCA 1981).

NON-CONFORMING VOTER CERTIFICATION ON ENVELOPES
Appellant claims that each of the 293 contested absentee ballots were invalid because the outer envelope which was signed by the elector and attesting witnesses did not recite the statutory reasons for which an elector is entitled to vote absentee.
In providing for the furnishing to the absentee elector the necessary materials to vote absentee, Section 101.64, Florida Statutes (1981), requires the election supervisor to enclose a mailing envelope bearing "a certificate which shall be substantially in the following form." The form provided for is, in pertinent part, as follows:
Note: Please Read Instructions Carefully Before Marking Ballot and Completing Voter's Certificate.
VOTER'S CERTIFICATE
YOU COME UNDER THE PURVIEW OF THE DEFINITION OF "ABSENTEE ELECTOR" IF YOU:
1. Are unable without the assistance of another to attend the polls.
[The remaining statutory grounds are set forth in five additional paragraphs.]
* * * * * *
I HEREBY CERTIFY THAT I AM VOTING ABSENTEE FOR ONE OF THE REASONS STATED ABOVE AND THAT I AM DULY QUALIFIED AND REGISTERED AS A (party) ELECTOR OF THE (precinct) OF (insert appropriate county) COUNTY AND THE STATE OF FLORIDA
 (Signature of Voter)
 VOTER MUST SIGN ABOVE
* * * * * *
The envelopes used by the City election officials included a certificate which certified that the voter was entitled to vote as an absentee elector but did not specify the various grounds for which an elector may vote absentee. Appellant says that the absentee ballots are, therefore, invalid and must be disregarded. A review of the recent legislative history relating to the above provisions is useful in resolving the question. It will be seen that there has been a gradual relaxation of the formalities required of electors in voting absentee.
*747 Section 101.62, Florida Statutes (1971), required an elector to complete a written application in order to be issued an absentee ballot. The application was to be in substantially the form as set out in that statute. The form called for the elector to "check the appropriate reason" for which he qualified as an "absent elector" which reasons were reproduced in the form. Section 101.64, Florida Statutes (1971), provided for a similar form to be included in an "elector's certificate" form on the outer envelope containing the first envelope with the marked ballot. In other words, Section 101.64 (1971), called for the elector to again certify as to the specific reason for which he was authorized to vote absentee.
In 1973, the Legislature amended Section 101.64, Chapter 73-157, Laws of Florida, eliminating from the elector's certificate the enumeration of reasons authorizing absentee voting and instead substituting the following:
"[I] am entitled to vote an absentee ballot for the reason stated in the application for an absentee ballot which I have signed."
Section 101.62 still provided for a written absentee ballot application requiring specification by the elector of the specific reason authorizing his absentee vote.
Section 101.62 was amended in 1977, Chapter 77-175, Laws of Florida, eliminating the requirement of a written application in order for an elector to receive an absentee ballot and eliminating any requirement that the elector certify to the reason for voting absentee as a prerequisite for receiving an absentee ballot. However, Section 101.64 was amended by the same law by again modifying the elector's certificate form appearing on the outer envelope by the inclusion of the various reasons for which an elector may vote absentee and further providing:
"[I] am entitled to vote an absentee ballot for the following reason: Check Only One"
In 1981, the Legislature again amended the elector's certificate form in Section 101.64 by eliminating the requirement that the elector certify as to which of the reasons listed in the form entitled him to vote absentee. Instead, as indicated previously in this opinion, the 1981 version of the Section 101.64 form (which was applicable to the subject 1982 City election) provided for a certification in which the elector certifies that "I am voting absentee for one of the reasons stated above." And so no longer was the elector required at any point in the process (whether in an application or request for ballot, elector certification accompanying the marked ballot, or otherwise) to specify the ground entitling the elector to vote absentee.[9]
Of significance to this discussion are other statutory changes which paralleled the above changes. Prior to 1975, there was a statutory provision, Section 101.66, Florida Statutes (1973)[10] which specifically charged the absentee elector with certain responsibilities in the manner in which the absentee ballot was to be completed including following the Section 101.65 instructions enclosed with the ballot and marking the ballot in secret. Section 101.66 was repealed by Chapter 75-174, Laws of Florida. No statute comparable to Section 101.66 was in effect at the time of the subject 1982 election. And so, although the statutes in existence in 1982 (Sections 101.64 and 101.65) did provide for the election official to send *748 to the absentee elector instructions for completing the absentee ballot and an elector's certificate in substantially the form set out in the statutes, there was no longer the specific legislative mandate charging the elector with the responsibility of complying with certain instructions.
Also, prior to 1977, Section 101.67(3) provided in part that an "absentee ballot shall be counted only where the application for absent elector's ballot is properly executed... ." That subsection was repealed by Chapter 77-175. Presumably, of course, it was repealed because of other changes in 1977 eliminating the previous requirement of written applications for absentee ballots. However, we think that this legislative action in 1977 is significant when it is realized that the Legislature has not seen fit to specifically provide for the invalidation of absentee ballots in which the voter's certification may vary from that provided for in Section 101.64.
Neither the 1981 version of Section 101.64 (the version applicable in the instant case) nor any other applicable statutory provision indicates a legislative intent that the inclusion of the specific grounds for voting absentee on the voter's certification is essential to the validity of the ballot or that omission thereof will cause the ballot not to be counted. Indeed, the legislative history outlined above suggests the contrary.
The essence of the 1981 version of Section 101.64 is the requirement that the elector certify that he is qualified to vote absentee under Florida law, not that the various criteria of absentee voting be reproduced in any particular place or form. If the voter, at the time he marks his absentee ballot, can certify generally, as contemplated by Section 101.64, that he is a qualified elector,[11] we do not see how the failure to include on the certification forms the various grounds for voting absentee can be regarded as kind of irregularity rendering invalid a ballot cast by an admittedly qualified elector. It cannot be fairly said that such irregularity is calculated to affect the integrity of the ballot or election.

BALLOT DISTRIBUTION TO UNAUTHORIZED PERSONS
The evidence showed that 32 absentee ballot forms for the runoff were released by election officials to third persons requesting ballots for electors without written authorization from the elector.
As previously noted, Section 101.62(4) (1981) provides that the election supervisor shall deliver or mail an absentee ballot to each elector for whom a request has been made. That section further provides, however, that the elector "may designate in writing a person to pick up the ballot for him" in which case the supervisor "may give the ballot to such designee for delivery to the elector." It appears that the 32 absentee ballots were released to third persons without written authorization from the elector because the city election officials were unaware of the above provisions of Section 101.62(4).
It is not contended that the lack of written authorization for any of the above referred absentee ballots resulted in votes being cast by anyone not qualified as an absentee elector. We agree with the trial court that the statute's provisions for written authorization is directory rather than mandatory. The applicable voting laws neither declare that the written authorization is essential to the validity of the ballot nor indicates that failure to require written authorization will cause the ballot not to be counted. As was stated in Carn v. Moore, 76 So. 337, 340 (Fla. 1917):
A voter may sacrifice his right to have his ballot accepted and counted for wrongful or illegal acts on his part; but he is not to be deprived of his constitutional rights by the neglect or willful wrong of a public officer charged with the duty of supplying him with the means or the opportunity *749 of expressing his choice. To deprive an innocent person of his rights because some public official fails to do his duty is abhorrent to our sense of right and justice, and we will not give to a statute a construction which will produce that result.
See also Boardman at 267.
Our opinion of the directory quality of the above provision for written authorization is further bolstered by the fact that the legislature has, through Section 101.62, authorized the supervisor of elections to mail an absentee ballot to an elector upon telephone request without any written application or authorization therefor. Although the statute presumably contemplates that the person making the telephone request be the elector himself, there would be no practical way for an election official to determine the identity of the person who was requesting the ballot. It would, therefore, be impossible to avoid an "unauthorized" person from telephonically causing the elections office to distribute by mail an absentee ballot to an elector.
Appellant contends, however, that the failure to require written authorizations for distribution of these 32 absentee ballots should be viewed differently by reason of the election officials' alleged discriminatory manner of enforcing the written authorization provision. On the day of the primary, election officials had become concerned over the number of persons coming into their office on primary day requesting multiple absentee ballots and Seckel informed appellant that no one could pick up an absentee ballot for a voter unless there was written authorization from the voter. Appellant assumed that this requirement of written authorization would be applied to the runoff election as well.
However, after the primary, the elections office reverted to its previous practice of not requiring written authorizations as a condition to the issuance of absentee ballots. Appellant claims that he was prejudiced by reason of the issuance of the 32 absentee ballots without written authorization and points to the fact that two such ballots were issued to candidate Chapman's son. With the exception of these two ballots, there is no indication, after exhaustive discovery, that any of the other 30 ballots were distributed to Chapman partisans. It cannot be fairly said that the issuance of those absentee ballots without written authorization was calculated to affect the integrity of the ballot or election.

FRAUD, INTENTIONAL WRONGDOING OR GROSS NEGLIGENCE
The presence or absence of fraud, intentional wrongdoing or gross negligence are factors to be considered in determining the legal effect of irregularities in the administration of the voting laws. Boardman at p. 269. Appellant alleged that the various irregularities were a result of intentional wrongdoing or gross negligence.
In addition to the facts already alluded to in this opinion, appellant relies upon certain additional facts to support his assertion that the election officials set out deliberately to skew the election in favor of Chapman. Appellant relies heavily upon Seckel's conflicting recollections as to whether absentee ballots for the runoff had been automatically mailed to all those who had received primary absentee ballots or just those who had voted absentee in the primary. During the canvassing of the voting by the canvassing board, Seckel, in response to a question by a canvassing board member, incorrectly stated that all of the individuals who had requested an absentee ballot for the primary received one for the runoff. Subsequently, during his deposition, Seckel stated that he was almost positive that the personnel in his office had informed him that the ballots went out to everyone who had requested a ballot for the primary but he did not recall telling the canvassing board that the ballots went out to all such voters. He also testified that he could not recall whether he instructed his office personnel to send the ballots to everyone or to just those voting in the primary. Seckel then stated that at the time of the canvassing board meeting, he was under the impression that the absentee ballots were *750 sent out to only those who had voted in the primary.
Appellant also asserts that "Seckel himself encouraged at least one voter to vote for Defendant Chapman." This allegation actually derives from friendly banter between Seckel and a young man in the parking lot of a Tallahassee store. In answer to the young man's admonition to vote for McLean, Seckel, in a jocular manner, said, "no, go ahead and vote for Judd Chapman."
Appellant asserts that "Seckel's action favoring Defendant Chapman was part of a larger pattern of city officials' support for Defendant Chapman's candidacy." In support of that assertion, appellant says that "[O]ne of Mr. Seckel's top assistants [Mr. Bramlett] helped Dr. Chapman in setting up a meeting with the head of the electrical department." The evidence relating to this assertion is that Mr. Bramlett, an administrator in Seckel's office, was approached by Chapman who expressed an interest in acquiring information regarding the city's power system. Bramlett recommended that Chapman see the head of the electrical department and Bramlett helped arrange for Chapman to meet with him.
Appellant also points to certain campaign advice given to Chapman in letter form by outgoing City Commissioner Sam Teague. The letter contained advice by Teague on campaign issues to Chapman, his long-time friend.
Appellant's case for fraud or intentional wrongdoing is lacking as reflected by the above examination of its component elements. We agree with the trial court's conclusion that the voluminous record in this case, developed after lengthy and exhaustive discovery, amply demonstrates that there is no genuine issue of material fact regarding the claim of fraud or intentional wrongdoing on the part of the city election officials.
It is obvious that the subject election was managed by the election officials in a manner other than in strict conformance with the applicable voting laws. It may well be that such irregularities were the result of negligence on the part of the election officials. However, any such negligence avails the appellant nothing because such negligence did not descend to the kind of gross negligence which the Supreme Court in Boardman equated with fraud or intentional wrongdoing. In any event, for the reasons previously discussed herein, we are of the view that the nature and extent of such irregularities, under the statutory provisions applicable at that time, were not of sufficient magnitude to support the invalidation of the absentee ballots and the concomitant disfranchisement of a large number of voters whose qualifications as electors have not been questioned and who have no fault whatsoever in the manner in which they cast their ballots.
The trial judge correctly entered summary judgment in favor of appellees and we therefore AFFIRM both partial and final summary judgments.
ROBERT P. SMITH, Jr., J., concurs.
ZEHMER, J., concurs specially.
ZEHMER, Judge, concurring specially.
Although I concur with the majority opinion, I feel it necessary to more fully explain my reasons for doing so.
I am convinced, based on the record in this case, that a full, fair, and free expression of the public will occurred in this election and that the irregularities shown to have taken place did not affect the integrity of the ballot or the election. Under Boardman v. Esteva, 323 So.2d 259 (Fla. 1976), that is the ultimate test. The decision in Esteva and our decision in this case are concerned primarily with a request to invalidate a large number of absentee ballots for the failure of election officials, rather than the individual voters, to follow statutory requirements. The validity of these absentee ballots should be upheld mainly because, "when the voters have done all that the statute has required them to do, they will not be disfranchised solely on the basis of the failure of the election officials to observe directory statutory instructions." Boardman v. Esteva, supra, at 268.
*751 The decisions in Esteva and this case, however, should not be taken as license to disregard either mandatory or directory requirements in the election statutes. Election officials are under an affirmative duty to determine the requirements of the election laws and to insure compliance therewith. Neither Esteva nor the decision in this case condones or excuses the derelictions and deviations from statutory requirements by election officials such as occurred in this case.
I concur in that portion of the majority opinion dealing with "Non-Conforming Voter Certification on Envelopes" only for the reason that the statutory provisions in effect at the time of the election in this case contained no requirement that a voter indicate the specific reason for voting absentee. The decision in this case refuses to invalidate absentee ballots because the form on the "mailing envelope," certifying that the voter is authorized to vote absentee, did not also include the several statutory reasons authorizing one to so vote. The voters in this case obviously signed the certificate provided by the election officials on the reasonable assumption that they had done all that was required of them. Our decision on this issue is not concerned with the validity of absentee ballots where voters, rather than officials, have deviated from a statutory requirement that is within the voters' control. Judge Nimmons' excellent analysis of the history of Section 101.64, Florida Statutes, and the various changes made to that section from time to time by the legislature convincingly demonstrates that the 1981 version of Section 101.64 applicable to this election contained no statutory requirement that a voter certify the specific reason for voting by absentee ballot. Since this disputed election occurred after the 1981 amendment eliminating that requirement and before the legislature restored that specific requirement by amendment in 1982 (Ch. 82-143, § 10, Laws of Florida), our decision necessarily leaves open the question of whether non-compliance with that requirement would invalidate an absentee ballot.[1] Unlike derelictions by election officials, however, a voter's failure to comply with such statutory requirement that is properly brought to the voter's attention by instructions on the mailing envelope, being a matter within the voter's responsibility and control, may well be cause to invalidate the ballot.
NOTES
[1] The trial court entered a partial summary judgment on July 8, 1982, from which appellant filed an appeal to this Court. Subsequently, this Court granted appellant's motion (consented to by appellees) to stay the prosecution of that appeal pending final resolution in the trial court of the remaining issues not disposed of by the partial summary judgment. On February 23, 1983, the trial court entered its final summary judgment disposing of all remaining issues. Appellant's appeal therefrom was consolidated with the previously filed appeal.
[2] Section 12-11 of the Tallahassee City Code provides that municipal elections shall be conducted "substantially on the principle adopted for state elections insofar as there is no conflict with the terms of this chapter or the terms of this charter."
[3] The election was held in two phases, a nonpartisan primary on February 9, 1982, in which there were six candidates and the February 23, 1982, runoff between appellant McLean and appellee Chapman.
[4] "101.62 Request for Absentee ballots. 

(1) An absent elector may request from the supervisor of elections or his deputy an absentee ballot during the 1-year period preceding an election. The supervisor may accept a request for an absentee ballot for an elector from any person designated by such elector. Such request may be made in person, by mail, or by telephone. One request shall be deemed sufficient to receive an absentee ballot for each election which is held within such 1-year period, provided the elector or his designee indicates at the time the request is made the elections for which the elector desires to receive an absentee ballot.
* * * * * *
(3) For each request for an absentee ballot received, the supervisor shall record the date the request was made, the date the absentee ballot was delivered or mailed, the date the ballot was received by the supervisor, and such other information he may deem necessary.
(4) As soon as the absentee ballots are printed, the supervisor of elections shall deliver or mail an absentee ballot to each elector for whom a request for such ballot has been made. Any elector, however, may designate in writing a person to pick up the ballot for him.
* * *"
[5] In addition, according to deposition testimony and affidavits filed on behalf of McLean, there were eleven others who said that they cast unrequested absentee ballots.
[6] Nowhere in the record of this case is there any indication of the machine votes cast in the primary and we are, of course, not at liberty to venture dehors the record.
[7] Lest there be any confusion with respect to these unrequested ballots, we should point out that there was no indication that any of these ballots were mailed out by the election officials without their having been properly marked or identified for use by a particular qualified elector.
[8] We recognize that, as indicated in Boardman, the determination that election irregularities arose out of the failure to comply with directory, as opposed to mandatory, statutory provisions is not the end of the inquiry if the irregularities were calculated to affect the integrity of the ballot or election. We will treat this aspect of our inquiry later in this opinion after examining each of the categories of claimed irregularities.
[9] The 1982 Legislature again amended Section 101.64 by restoring the requirement that the particular ground for voting absentee be specified in the elector's certificate. Chapter 82-143, Laws of Florida. Of course, that change is not applicable to the subject 1982 City elections which occurred before passage of the above amendment, and we express no opinion as to what our conclusion on this issue would be had the Chapter 82-143 amendments been applicable to this election.
[10] "Upon the receipt of the absentee ballot and printed instructions as provided in § 101.65, the absent elector shall, in secret, mark his ballot, follow the instructions enclosed with his ballot, place only the marked ballot in a plain envelope and return same to the supervisor of the county in which his precinct is located."
[11] A qualified elector in Florida, as provided by Section 97.041, Florida Statutes, is a person who is over 18 years of age, a citizen of the United States and a permanent resident of Florida and the county where registered, has not been declared mentally incompetent and not restored to competency, has not been convicted of a felony and not been restored to civil rights.
[1] It should be noted that in Boardman v. Esteva, supra, the trial court concluded that a voter's failure to comply with the statute then in effect by making a checkmark by one of the five reasons for voting absentee in the place provided on the mailing envelope would not be deemed fatal to the validity of some seventy-nine ballots; but it further stated that even if such ballots were treated as illegal they would not change the results of the election. This court refused to treat this requirement so lightly and did not agree that such ballot would be valid. Esteva v. Hindman, 299 So.2d 633 (Fla. 1st DCA 1974). The Supreme Court's decision in Esteva, although quashing that decision, did not discuss what effect the "substantial compliance rule" would have on this particular statutory requirement. In view of the legislature's having restored this requirement in 1982 after having deleted it in 1981, it hardly seems that such requirement could now logically be merely directory and freely excusable under that rule.