707 So.2d 1170 (1998)
In re THE MATTER OF THE PROTEST OF ELECTION RETURNS AND ABSENTEE BALLOTS IN the NOVEMBER 4, 1997 ELECTION FOR the CITY OF MIAMI, Florida.
No. 98-507.
District Court of Appeal of Florida, Third District.
March 11, 1998.
*1171 Coffey, Diaz & O'Naghten and Kendall Coffey, Miami; Geller Geller Garfinkel & Fisher and Joseph S. Geller, Hollywood; Sale & Kuehne and Benedict P. Kuehne; Shubin & Bass and John Shubin and Jeffrey S. Bass, Miami, for Joseph Carollo.
Joseph J. Portuondo and Manuel R. Lopez, Miami; Marcos A. Gonzalez Balboa, Hialeah; Luis Fernandez, Miami, for Xavier Suarez.
Joel Edward Maxwell, Interim City of Miami Attorney, Miami, for the City of Miami.
Before COPE, LEVY and SORONDO, JJ.
PER CURIAM.
This appeal involves an election contest which occurred during the November 4, 1997, Miami Mayoral election. After considering the evidence, the lower tribunal issued a Final Judgment which found that the evidence demonstrated an extensive "pattern of fraudulent, intentional and criminal conduct that resulted in such an extensive abuse of the absentee ballot laws that it can fairly be said that the intent of these laws was totally frustrated." The lower court ordered that the appropriate remedy was to declare the entire Mayoral election void and order that a new election be held within sixty (60) days. While we find that substantial competent evidence existed to support the trial court's findings of massive fraud in the absentee ballots, we disagree as to the appropriateness of the trial court's remedy in ordering a new election.
In July, 1996, Joe Carollo became the Mayor of the City of Miami. On November 4, 1997, a general election was held for the position of Executive Mayor, with Joe Carollo and Xavier Suarez as two of the contenders. Carollo received a majority of the precinct votes (51.41%) and Suarez received a majority of the absentee votes (61.48%), resulting in Carollo receiving 49.65% of the votes and Suarez receiving 46.80% of the *1172 votes when the absentee ballot votes were combined with the machine precinct votes.
Since neither of the parties received a majority of the overall votes, a run-off election was held on November 13, 1997. In that election, Suarez defeated Carollo in both precinct votes and the absentee votes. On November 14, 1997, the results of the November 13, 1997, election were certified and Suarez assumed the position of Mayor of the City of Miami. On the same day, Carollo filed a protest to the run-off election pursuant to Section 102.166, Florida Statutes (1997), as well as the November 4th and November 13th election results, under Section 102.168, Florida Statutes (1997). The filings were consolidated. The principal relief sought by Carollo was to be declared the victor of the Mayoral election, having received a majority of the "untainted" precinct votes or, in the alternative, for a new election.
A bench trial was held and, on March 3, 1998, the trial court declared the Mayoral election void. This judgment was based on the trial court's finding of massive absentee voter fraud which affected the electoral process.
The uncontradicted statistical evidence presented by Kevin Hill, Ph.D., a political scientist and expert in research methodology and statistical analysis, indicated that the amount of fraud involved in the absentee ballots was of such consequence so as to have affected the outcome of the election. Dr. Hill analyzed the absentee ballot voting, finding that the absentee ballots cast in Commission District 3 could not be explained by any normal statistical measurement.[1] District 3 is the area which the trial court found "was the center of a massive, well conceived and well orchestrated absentee ballot voter fraud scheme." Dr. Hill referred to the results of the absentee ballots as an "outlier" and an "aberrant case" so unlikely that it was "literally off the charts" of probability tables. The odds of this occurring by chance were 5,000 to 1. (Final Judgment, n. 7).
Dr. Hill finally concluded it was "reasonable" that the absentee ballot deviation in favor of Suarez resulted only from voting fraud, ruling "out almost every other conceivable possibility to a high degree of probability."[2]
An expert documents examiner, Linda Hart, concluded that 225 illegal absentee ballots were cast, in contravention of statutory requirements.[3] An FBI agent with 26 years of experience, Hugh Cochran, identified 113 confirmed false voter addresses. There was evidence of 14 stolen ballots, and of 140 ballots that were falsely witnessed.[4] In addition, evidence was presented that more than 480 ballots were procured or witnessed by the 29 so-called "ballot brokers" who invoked their privilege against self-incrimination instead of testifying at trial.[5]
The trial court specifically found that the above described absentee ballot voter fraud scheme, "literally and figuratively, stole the ballot from the hands of every honest voter in the City of Miami". The trial court further found that, as a result thereof, "the integrity of the election was adversely affected." Based on our review of the record, there was certainly ample evidence of fraud to support the findings of the trial court's Final Judgment. See Peacock v. Wise, 351 So.2d 1134 (Fla. 1st DCA 1977); see also generally Wald v. Shenkman, 664 So.2d 10 (Fla. 3d DCA 1995); Estate of Gimbert v. Lamb, 601 So.2d 230 (Fla. 2d DCA 1992).
We are confronted with the question of whether the trial court erred in finding that the remedy for the instant absentee voting fraud was to order a new election. We hold that it did.
An important decision concerning the issue of the appropriate remedy to be provided *1173 upon a finding that absentee ballot fraud has affected the electorial process is Bolden v. Potter, 452 So.2d 564 (Fla.1984). In that case, the Supreme Court of Florida held that: "Although the will of the electorate must be protected, so must the sanctity of the ballot and the integrity of the election. Courts cannot ignore fraudulent conduct which is purposefully done to foul the election or corrupt the ballot. See Wilson v. Revels, 61 So.2d 491 (Fla.1952)." Id. at 567. The Supreme Court of Florida went on to expressly approve the trial court's remedy, which was to invalidate all of the absentee ballots and, thereafter, to solely rely on the machine vote to determine the outcome of the election. Similarly, in Boardman v. Esteva, 323 So.2d 259 (Fla.1975), app. dism., 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976), the Supreme Court of Florida held that "[T]he general rule is that where the number of invalid absentee ballots is more than enough to change the result of an election, then the election shall be determined solely upon the basis of machine vote." Id. at 268 (emphasis added); see also, Peacock v. Wise, 351 So.2d 1134 (Fla. 1st DCA 1977) (holding that the trial court was correct in declaring all absentee ballots invalid and ousting the appellant from the office of clerk of the circuit court as a result, based upon the machine vote); McLean v. Bellamy, 437 So.2d 737 (Fla. 1st DCA 1983) ("the machine votes shall solely determine the election results" as a proper remedy for absentee ballot fraud).
We are mindful of the fact that the trial court found there was no evidence that Mr. Suarez knew of, or in any way participated in, the absentee voter fraud. However, as the Supreme Court stated in Bolden v. Potter:
We also reject the district court's implication that the burden of proof, with regard to fraud or corruption, is dependent upon the status of the offender. It makes no difference whether the fraud is committed by candidates, election officials, or third parties. The evil to be avoided is the same, irrespective of the source. As long as the fraud, from whatever source, is such that the true result of the election cannot be ascertained with reasonable certainty, the ballots affected should be invalidated.
Id. at 567.
While we recognize that the above cases do not explicitly state that the exclusive remedy for massive absentee voter fraud is to determine the election solely based on machine vote, that form of remedy has, historically, been consistently approved since the 1930's. See State ex rel. Whitley v. Rinehart, 140 Fla. 645, 192 So. 819, 823 (1939). In addition, we note a complete absence of any Florida Appellate Court decision upholding the ordering of a new election in the face of such fraudulent conduct relating to absentee ballots. Mr. Suarez contends that to eliminate all of the absentee ballots would effectively disenfranchise those absentee voters who legally voted. We first note that unlike the right to vote, which is assured every citizen by the United States Constitution, the ability to vote by absentee ballot is a privilege. In fact, the Florida Legislature created this privilege by enacting statutory provisions separate from those applicable to voting at the polls. See Anderson v. Canvassing and Election Board of Gadsden County, 399 So.2d 1021 (Fla. 1st DCA 1981) (ability to vote by absentee ballot is a privilege created by the State) (citing State ex rel. Whitley v. Rinehart, 140 Fla. 645, 192 So. 819, 823 (1939)("[P]urity of the ballot is more difficult to preserve when voting absent than when voting in person"); Spradley v. Bailey, 292 So.2d 27 (Fla. 1st DCA 1974)); see also Bolden v. Potter, 452 So.2d 564 (Fla.1984) (expressly rejecting the contention that invalidating all absentee ballots, in the face of extensive absentee vote buying, was an unjustified disenfranchisement of those voters who cast legal ballots).
Section 102.166(11), Florida Statutes (1997), which governs the protest of election returns, provides that "The circuit judge to whom the protest is presented shall have authority to fashion such orders as he or she may deem necessary to ensure that such allegation is investigated, examined, or checked; to prevent or correct such fraud; or to provide any relief appropriate under such circumstances. Any candidate or elector presenting such a protest to a circuit *1174 judge shall be entitled to an immediate hearing hereon or to any appropriate relief." In the instant case, we find that the legally "appropriate relief" required is to invalidate the absentee ballots from the November 4, 1997, election, and determine the outcome of the election based solely upon the machine count. See Bolden v. Potter, 452 So.2d 564 (Fla.1984); Boardman v. Esteva, 323 So.2d 259 (Fla.1975); McLean v. Bellamy, 437 So.2d 737 (Fla. 1st DCA 1983); Peacock v. Wise, 351 So.2d 1134 (Fla. 1st DCA 1977).
Consistent with the fact that there is no legal precedent in Florida to support the action of the trial court in ordering a new election as the proper remedy upon a finding of massive absentee voter fraud is the public policy of the State of Florida to not encourage such fraud. Rather, it must be remembered that the sanctity of free and honest elections is the cornerstone of a true democracy. As the Supervisor of Elections, David Leahy, noted during his trial testimony, were we to approve a new election as the proper remedy following extensive absentee voting fraud, we would be sending out the message that the worst that would happen in the face of voter fraud would be another election. Specifically, Mr. Leahy was asked at trial, "[D]id you express the opinion that after the Hialeah election, in your opinion, the message that was out there was that if you were engaged in these violations, the worse [sic] that is going to happen is we are going to have a new election?" He answered, "Yes, I do [sic]."
Further, we refuse to disenfranchise the more than 40,000 voters who, on November 4, 1997, exercised their constitutionally guaranteed right to vote in the polling places of Miami. In the absence of any findings of impropriety relating to the machine vote in this election, public policy dictates that we not void those constitutionally protected votes, the majority of which were cast for Mr. Carollo. In addition, a candidate who wins an election by virtue of obtaining a majority of the votes cast is entitled to take office as a result thereof, and not be forced into a second election, whether it is a statutorily mandated run-off election or a court ordered special election, when the said second election only comes about due to absentee ballot fraud, in the first election, that favored one of his or her opponents.
We note that the out-of-state cases cited by the appellee for the proposition that a new election is an appropriate remedy following massive absentee ballot fraud are distinguishable. In Rogers v. Holder, 636 So.2d 645 (Miss.1994), the Supreme Court of Mississippi held that the invalidation of all absentee ballots was improper where the appellant only met his burden of proving fraud beyond a reasonable certainly as to twelve (12) absentee ballots. Thus, "... it would appear imprudent to declare all absentee ballot votes ... void, thereby disenfranchising those voters." Id. at 650. In the instant case, the trial court expressly found that the appellant, Carollo, met his burden of demonstrating absentee ballot fraud to such a degree that "the integrity of the election was adversely affected". See also, Marks v. Stinson, 19 F.3d 873 (3d Cir.1994)(Where voters were wrongfully told that they could vote absentee as a matter of convenience and that advice was incorrect under Pennsylvania law, it was impermissible to invalidate all absentee ballots because, inter alia, had the voters been given correct advice, they may have gone to the polls and voted in person); Stringer v. Lucas, 608 So.2d 1351 (Miss.1992) (The remedy of an entirely new election, in the presence of absentee ballot fraud, is only appropriate when the integrity of the election is destroyed to the extent that the will of the qualified voters is impossible to ascertain).
We expressly hold that substantial competent evidence supported the trial court's finding that extensive absentee voter fraud affected the outcome of the November 4, 1997, City of Miami Mayoral election. Further, our consideration of the relevant case law and strong public policy considerations lead us to the inescapable conclusion that the only appropriate remedy for this absentee voter fraud is the invalidation of all absentee ballots.
To the extent that the trial court's remedy, to correct the massive absentee ballot fraud that occurred in the November 4, 1997, election involved the holding of a completely new election which, in effect, invalidated all of the machine votes that were cast by the voters in *1175 person at the polls, we find that such a remedy is not warranted by Florida legal precedent. As a result, the voiding of the entire election and the ordering of a new election is hereby reversed, and this cause is remanded to the trial court with directions to enter a Final Judgment, forthwith, that voids and vacates the absentee ballots only and, furthermore, provides that the outcome of the November 4, 1997, City of Miami Mayoral election shall be determined solely upon the machine ballots cast at the polls, resulting in the election of Joe Carollo as Mayor of the City of Miami. Consequently, the trial court's Final Judgment shall delete the requirement of the holding of a new election since, by virtue of the foregoing, there is no need for such an election.
Although Xavier L. Suarez filed a Notice of Cross-Appeal, he failed to file his Initial Brief, in connection with the said Cross-Appeal, as directed by this Court. Accordingly, the Cross-Appeal is dismissed by virtue of the fact that it was abandoned by the cross-appellant.
In view of the exigent circumstances surrounding this case, no motions for rehearing will be entertained. This decision is deemed final upon filing.
Affirmed in part, reversed in part and remanded with directions.
NOTES
[1] Dr. Hill's relevant testimony is found at Appellant's Appendix Vol. VIII, Afternoon Session, p. 5-72.
[2] Dr. Hill estimated that the "aberrant" absentee ballots in Commission District 3 cost Mr. Carollo more than the 160 votes that he needed in order to secure outright victory in the November 4, 1997, election.
[3] Appellant's Appendix Vol. VI, page 82.
[4] Appellant's Appendix Vol. XIII, pages 7, 26.
[5] Appellant's Supplemental Appendix, Master Objection List.